### WILLIAM HARRIS, JR., v. THE STATE.

*No. 70. Decided January 7.*

1. **Conspiracy—Acts and Declarations of Parties to, Admissible in Evidence, when.**—The old rule that a conspiracy must first be established before the acts and declarations of individual conspirators are admissible against each other, is now exploded. Following Smith's case, 21 Texas Ct. App., 120.

2. **Same—Charge of the Court.**—The time when a conspiracy is entered into being often a disputed fact, and susceptible of proof only by circumstantial evidence and proof of isolated and independent facts, the proper practice under the law as it now exists requires that the trial court should submit that fact to the jury, under proper instructions to disregard any act or declaration not occurring during the existence of the conspiracy, as was done in this case.

3. **Same.**—On this trial, with reference to the charge of the court upon the question of conspiracy and the acts and declarations of coconspirators as evidence, the defendant complained that the trial court failed to properly guard his interest, but allowed the jury to consider any act of the codefendants, without regard to the beginning or the end of the conspiracy, in determining his guilt. But *held*, that the objection can not be maintained. See the second paragraph of the opinion for the substance of the impugned charge, *held* correct.

4. **Evidence—Proof of Ill-Feeling and Threats of a Third Party.** A defendant on trial for murder proposed to introduce evidence of the ill-feeling and previous threats of an independent third party against the deceased, which proposed proof, upon objection, was excluded. *Held*, that in view of the other proof on the trial, which tended to show the presence of both the defendant and the said third party at the time and place, and their participation in the homicide, and because of the further fact that such proof would in no event show the absence of the defendant from the place of the homicide, the exclusion of the proposed evidence did not constitute reversible error.

5. **Murder—Evidence—Fact Case.**—It is complained on appeal that the evidence on the trial is insufficient to inculpate the defendant as a party present or involved in the homicide. But *held*, that the proof is amply sufficient to sustain the verdict of the jury, condemning the defendant as both a party present and a guilty participant in the murder. See the opinion in extenso for substance of the evidence.

[411]

Appeal from the District Court of Shelby. Tried below before Hon. Geo. F. Ingraham.

Appellant William Harris, Jr., one Fayette Harris, one Chas. Petty, and one James Stanton were jointly indicted for the murder of one Jo Shields, on the 28th day of January, A. D. 1892, in the County of Shelby, State of Texas. Upon motion of the appellant, William Harris, Jr., the court granted a severance in the case, and by agreement the said William Harris, Jr., this appellant, was first placed upon trial on the 19th day of April, 1892. The trial resulted in his conviction for murder in the first degree, with his punishment assessed at confinement in the penitentiary for life.

The record is a most voluminous one, the statement of facts itself covering 120 pages; but inasmuch as the opinion of the court presents a concise, but at the same time a most lucid, exposition of all the most prominent facts in the case, we deem it unnecessary to give a more extended statement. Nor do we deem it necessary to set out in full such charges of the court as were excepted to, inasmuch as the opinion presents them, in substance, sufficiently.

*Davis & Garrison, J. H. Truitt,* and *F. L. Johnston,* for appellant.— 1. The court erred in the sixth and seventh paragraphs of the charge to the jury in this case, in this, that said charges do not state what acts and declarations of a codefendant would not be evidence against others than himself, and leaves the jury to consider any acts and declarations of codefendants reaching back through a lifetime, whether made before or subsequent to the formation of the conspiracy.

Acts or declarations of a coconspirator can not be used in evidence against any one except himself, unless the act or declaration is made or done in pursuance of a common design and after the formation of a conspiracy. Preston v. The State, 4 Texas Ct. App., 197; Cox v. The State, 8 Texas Ct. App., 255; Armstead v. The State, 22 Texas Ct. App., 58; 1 Greenl. on Ev., 111, 894; Wright v. The State, 43 Texas, 170; Id., 116; 4 Am. and Eng. Encyc. of Law, 631–634, and cases there cited; Fauts v. The State, 7 Ohio, 471; The People v. Gorham, 23 N. Y., 93; Clark v. The State, 28 Texas Ct. App., 189; 57 Iowa, 730.

2. The court erred in the eighth paragraph of the charge; first, because the jury is not restricted to any time when the acts and declarations of a codefendant would be evidence against others than himself; second, that no acts or declarations of a coconspirator can be used in evidence except such as are made in pursuance of a common design, after the formation of a conspiracy. Authorities above; 28 Texas Ct. App., 189; 4 Am. and Eng. Encyc. of Law, 633, and cases cited.

3. There is no evidence in this case that shows either directly or indi-

rectly a complicity of the defendant in the homicide.   18 Texas, 713;  22 Texas, 400;  43 Texas, 170;  4 Texas Ct. App., 186.

4. When the issue on the trial is whether the defendant did the killing, he has a right to show that some other person did the killing, by the same character of evidence relied upon by the State for a conviction. The court erred in not permitting Homer Stephenson to testify as to the bad feelings between Ardis Page and the deceased, Jo Shields.   Dubose v. The State, 10 Texas Ct. App., 248;  Means v. The State, 10 Texas Ct. App., 23.

These gentlemen also filed with their printed brief an able and elaborate argument in support of their propositions.

*John. H. Truit*, for appellant, in a supplemental brief.—Although a man be present whilst a felony is being committed, or have knowledge that it is about to be committed, if he take no part in it, and do no act in concert with those who committed or are about to commit it, he will not be a principal merely because he did not endeavor to prevent the perpetration of the act or apprehend the felon.   Whether he was aware of the intentions of his companions and participated with them in the perpetration of the criminal act, is the fact to be proved in order to implicate him in the criminality of the act.   Burrell v. The State, 18 Texas, 713.

And in support of the proposition and statement under the first assignment of errors, as shown by brief heretofore filed:  Hogan v. The State, 13 Texas Ct. App., 319.

On the motion for rehearing, *Tom C. Davis* and *Hugh B. Short* also filed an able and interesting brief for appellant.

*R. L. Henry*, Assistant Attorney-General, for the State.

SIMKINS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at imprisonment for life in the penitentiary, from which judgment he appeals.

There are four errors assigned, which it will be necessary to consider.

1. That the court erred in permitting certain witnesses to testify as to the motive, malice, and threats of Fayette Harris against Jo Shields, the deceased, as shown in the bill of exceptions.

On the night of January 28, 1892, between 9 and 11 o'clock, Jo Shields, a young man residing with Mrs. Pinson, an old lady 70 years of age, and living in Shelby County, was taken out and hung.   The State, to show motive for the crime, proved the acts and declarations of Fayette Harris, a codefendant, against the deceased, extending back for a year before the trial.   The defense objected to this testimony, upon the ground that only

those acts and declarations of a codefendant were admissible against defendant which transpired during the existence and in pursuance of a conspiracy, and not before or after it.    The acts and declarations of Fayette Harris occurring long prior to the formation of the conspiracy were introduced by the State, and duly excepted to in fifteen bills of exceptions. Like many other propositions of law, the rule is definite (Roscoe's Criminal Evidence, 416; Wharton's Criminal Law, 702), but its application is generally a question of difficulty.    It has been frequently before this court.    Krebs v. The State, 8 Texas Ct. App., 1; Preston's case, Id., 35; Crook's case, 27 Texas Ct. App., 240; Jim Smith's case, 21 Texas Ct. App., 102; M. Smith's case, 21 Texas Ct. App., 120; Pierson's case, 18 Texas Ct. App., 556; Thompson's case, 19 Texas Ct. App., 595.

In the case of M. M. Smith, 21 Texas Court of Appeals, 120, this court held that the old rule, that a conspiracy must first be established before the acts and declarations of individual conspirators are admissible against each other, is now exploded.    Such a rule can not be invoked " where the proof depends on a vast amount of circumstantial evidence, and a vast number of isolated and independent facts.''    The time when a conspiracy is entered into is often a disputed fact, and must then be submitted to the determination of the jury, under instructions to disregard any act or declaration not occurring during the existence of the conspiracy.    Under this practice this court, from the very necessity of the case, can not reverse because of proof of the conduct of one or more conspirators that may have preceded the conspiracy.    Still less would it be inclined to reverse in cases like the one at bar, where the objectionable testimony went to prove the same fact which was otherwise shown by competent testimony.    Thus it is shown by legitimate testimony that Fayette Harris bore a bitter animosity to the deceased up to the day of his death.    The testimony objected to simply proved that the animosity extended back a year prior to the homicide; that it was a matter of public notoriety; that defendant knew of and sympathized with it; and that his presence at the homicide was consistent with his feelings.    There is no question but that the homicide was the result of a conspiracy deliberately planned and consummated.

The question in this case was whether the defendant was present at the homicide.    By his own testimony, the testimony of Mrs. Fayette Harris, and Waller, and his own repeated declarations, defendant was with Fayette Harris from 8 until 11 on the night of the homicide.    It was in this interval of time that Jo Shields was murdered.    If, then, Fayette Harris was present, so was defendant.    For obvious reasons, therefore, it devolved upon the State to establish the guilt of Fayette Harris.    It sought to do so by proof of a long existing hatred and jealousy, of repeated deliberate preparations to kill the deceased, and of an actual attempt to do so, and finally by the evidence of a witness to the homicide.    It was evi-

dently the theory of the State that Fayette Harris, the uncle of the defendant, was the instigator of the whole matter; that fearing that Jo Shields would get a large share of Mrs. Pinson's property if he continued to live with her, he (Harris) first tried to get her to discharge deceased, and failing in that, he began a systematic plan of trying to turn the whole neighborhood against him, and had succeeded in getting a mob of six or eight to assist him to carry out his plan to murder. The primary question, then, being the guilt of Fayette Harris, neither reason nor common sense required that evidence tending to prove that guilt should be excluded; but, as has been well said, "when a foul assassination like this has occurred, and the circumstances attending it are shrouded in mystery, the command of the law is, 'Turn on the light.'" In the case of Smith v. The State, 21 Texas Court of Appeals, 102, this very question was presented. It was objected that defendant in that case could not be bound by the acts and declarations of one whom the State claimed to be the originator of the conspiracy, occurring before there was any conspiracy formed. This court held, that though no conspiracy in fact existed, the testimony was admissible to show the guilt of the originator, and then the State could prove defendant's connection therewith. We see no error in admitting the testimony, especially as it was duly guarded by the charge of the court.

2. Defendant complains that the court erred in not properly guarding the defendant's interest in his charge, but allowed the jury to consider any act of the codefendants, without regard to the beginning or end of the conspiracy, in determining defendant's guilt. An examination of this charge will not sustain this contention. The court charged, substantially, that where a conspiracy was entered into between two or more, the acts and declarations of each in regard to the common purpose are the act and declaration of all; and when one enters into a conspiracy already formed, every act done by the others, before his entry or afterwards, in pursuance of the common design, and until its consummation, is the act of the one so entering. If the jury believes, beyond a reasonable doubt, that Harris and others formed a common purpose to kill deceased, and defendant entered into the conspiracy at any time before the death of Shields, "the acts and declarations of the conspirators" made and done in pursuance of the common design *after* said agreement was entered into by Fayette Harris and others, and *before* the killing of Shields, were admissible against defendant; but if defendant did not enter into such conspiracy, they should disregard such testimony in passing on defendant's guilt. Appellant objects to the latter portion of this charge, on the ground that the court should have charged, that if defendant did not enter into the conspiracy before the death of Shields, they should acquit defendant. It is to be observed that the court was charging upon the consideration of certain testimony then before the jury, admitted by the

court upon the theory of a conspiracy, and the court was simply telling them, that unless the defendant entered into the conspiracy, they could not consider the testimony for any purpose. And in that point of view the charge was correct. Upon the question of defendant's guilt, the court charged, that if the jury had a reasonable doubt of defendant's presence at the time and place of the homicide, they should acquit him, and this was sufficient.

3. Appellant complains that the court erred in not permitting him to prove the ill-feeling and threats of Ardis Page and others against deceased. Conceding that the court should have permitted this testimony, we can not see how it would have benefited the defendant. The fact that Ardis Page and others were present at the homicide in no way tends to prove that defendant was absent. Indeed, the testimony seems clearly to indicate that there were others present besides those indicted in this case. Mrs. Pinson says, when they were dragging Jo Shields up the road, she heard a considerable noise in the bushes on the same side with the lot, and it sounded like horses. Again, Randolph Tyer, a witness for the State, declares that the tracks show that seven or eight men were present. Again, the identified tracks of the "Tobe" mule, and other mules coming from the direction of Rainsville, and hitched near the scene of homicide, indicate with strong probability the presence and identity of other parties who came to take part in the bloody drama. But, if Mrs. Pinson is to be believed, Fayette Harris was one of the parties present, and from defendant's own lips comes the confirmation that he was with Fayette Harris at this time. Preston's case, 8 Texas Ct. App., 35, 36.

4. Appellant insists that this case ought to be reversed because there is no evidence directly or indirectly connecting defendant with the homicide. We do not agree with him. Not only does defendant's own testimony, with that of other witnesses introduced by him, prove that defendant was with Fayette Harris on that fatal night, and irrevocably binds his fate to that of his uncle, but there are independent facts in the record strongly tending to corroborate that statement. It seems that Fayette Harris first married Mrs. Pinson's daughter, by whom he had two children, who, at the death of their mother, and upon their father's second marriage, resided with their grandmother; that the deceased, Jo Shields, three years before the homicide, rented Mrs. Pinson's farm, and took charge of it, and supported Mrs. Pinson and her grandchildren. The kindness of the old lady to young Shields aroused the bitter jealousy of Fayette Harris, who saw in the intruder a possible heir and owner of the old lady's property, worth $2000, and he began planning to drive him out of the property, to which he probably felt he had the better right. He endeavored to do this by compelling Mrs. Pinson to discharge Shields, by trying to drive him away through fear, and finally destroyed him through a mob. His repeated efforts to induce Mrs. Pinson to drive Shields away failed;

so did his efforts to drive him away. Indeed, a month before the homicide he attacked the deceased, but was severely handled, and his whiskers torn out. On being allowed to rise, he suddenly shot at deceased, but missed him. He then strove to excite the ill-will of the neighborhood against deceased, and openly spoke of his preparation and intention of killing him. He not only threatened him in conversation with neighbors, but even spoke to parties with whom he was not on intimate terms, and told them the story of his wrongs, to-wit, how Jo Shields was getting away with his children's property.

It seems too clear for doubt that defendant knew of and shared in the ill-will of his uncle, and indulged in bitter denunciations of the deceased, regretting that he was not present at the fight, stating that he was going to see his uncle, and the ——— of a ——— ought to be hung; and on another occasion stating that his light would go out if he did not mind. On the morning of the homicide defendant dined with the deceased. The ostensible purpose was to get a favor from Jo Shields. They rode off together after dinner, and when separating in the evening, defendant was twice heard to ask Jo Shields if he would return home that night. Defendant, on the day of the homicide, in desiring one White to arrange a credit for him with Jo Shields, requested to arrange it that day, as he (defendant) would have something to do the next day. After separating from Shields, and two hours before the homicide, defendant delivered a horse that he had sold to one Tom Reed. There was an old three-quarter-inch grass rope, fifteen feet long, around the horse's neck, which was taken off by Reed, doubled up, and handed to one Louis Tyer, who delivered it to defendant, who tied it to his saddle. Both of these witnesses, while they can not identify the rope, state that it resembles in length and appearance the rope with which Shields was hung; the witness Tyer stating he had often seen a similar rope about the neck of defendant's horse. Defendant had a newer rope and one of the same length on his horse's neck next day, which he proved by a witness and his own testimony was his rope. So it is to be noted, that at the lot fence where the mob lifted Jo Shields over, they picked up next morning a steel watch chain, with a stirrup charm. It was shown that defendant Jim Stanton had purchased a similar chain and charm; yet on the trial another chain was produced like the one found, but with a different charm. These may be slight circumstances, but perhaps the facility with which the duplicate of the watch chain was supplied created a doubt in the mind of the jury as to the genuineness of defendant's disclaimer of the rope found around the neck of Shields.

Again, the morning after the homicide, before the fate of Jo Shields was known, defendant stated to Bud Powers that Shields had been taken out and hung. He claimed the news was obtained through Firman. Yet,

as a fact, the only statement that had been made was that three men had carried Jo Shields off. Defendant claimed an alibi for himself and Fayette Harris at the time of the killing. He says, after delivering the horse to Reed, he rode to his uncle's, and remained with him till after supper. They left the house at 8 o'clock and did not return till 11:15. This is fully corroborated by Mrs. Fayette Harris. It was during this interval Jo Shields was killed. It was one mile to Mrs. Pinson's. Defendant claims that he and his uncle spent this interval in visiting Warren's house, who lived three-fourths of a mile off, and this is corroborated by Warren and wife. But apart from the bad reputation of Warren for truth, and their finding at Warren's house a lightwood splinter like those found at Jo Shields' body, the testimony of Mrs. Pinson, stated with vivid recollection and exactness, seems to have caused the jury to utterly disregard the statement of Warren and his wife. She says she was sitting up awaiting the return of Jo Shields, who went off after dinner with defendant. An hour before his return (about 9:30) she hears a halloo at the lot, which she thought was Jo's voice. It was probably the parties on watch signaling other members of the mob just arriving. Mrs. Pinson finally hears Jo Shields coming home. He was whistling. She hears him riding in the lot, and throw his saddle on the floor of the crib, when suddenly she hears him scream, " Oh, Mrs. Pinson, run here." She hurries out to the lot, and in the starlight she sees three men in the lot, bent down over Jo Shields on the ground. She cries, "Jo, what is the matter ?" He replies, " Harris is killing me." Jo Shields always spoke of Fayette Harris as " Harris."

It was too dark to distinguish the forms with certainty, but she hears and recognizes Fayette Harris' voice giving orders in a low tone. She is within five feet of them, the fence between them and herself. They take him up and carry him across the lot, and she gets around as they are lifting him over the fence. She hears Shields say in a choked voice, "Oh, boys, don't." Again she hears and recognizes Harris' voice. She follows them, and as they jerk and drag him along the road for 300 yards, sometimes she gets in ten steps. Three times she is warned back by one of the parties, whose voice she clearly recognizes as Charles Peddy's, with which she was perfectly familiar, he having lived on her place, and was then in the employ of Fayette Harris, and living on his place. She then turns back and tries to arouse the neighborhood, but in vain. The next morning the search begins, and the bloody corpse of Shields is found about three-fourths of a mile in the woods, hanging to a tree, with arms and feet tied. The statement of Mrs. Pinson as to the manner of the murder is corroborated in the strongest manner by the tracks, the evidence of struggle, the unsaddled mule in the lot, the traces in the road of the dragging. The presence of Fayette Harris is not only betrayed by

his voice, familiar for fourteen years to Mrs. Pinson, but by the evidence·
of the dying Shields—"Harris is killing me."

The record is very voluminous. We have carefully examined it to see·
that no injustice has been done to the defendant. He has been most ably
defended. There were seventeen bills of exception reserved, and every
defense interposed that the evidence would justify, but the facts were too
strong to be rebutted. The reason why the penalty of death was not in-
flicted seems to have been that the jury believed that the defendant was
led by the influence of his uncle into this bloody crime. We see no error
in the case, and it is affirmed.

*Affirmed.*

Judges all present and concurring.