## ED. CHAPMAN v. THE STATE.

### No. 2820.   Decided October 28, 1903.

**1.—Evidence—Conspiracy.**

See opinion for testimony held to be sufficient to admit the acts and declarations of coconspirators made in the absence of the one on trial.

**2.—Charge of Court—Principals—Conspiracy.**

Where there is no evidence showing that defendant shot and killed the deceased, or knew that he was present at the time of the difficulty, a charge on the law of principals is unnecessary; but where the testimony further tends to show that there was an agreement beforehand between defendant and others to assault and kill a certain person and any other who might inter- fere to prevent the execution of their design, it would embrace the deceased in its scope, who appeared after the difficulty between defendant and such person had begun and engaged in it, apparently on the side against the defendant, and was killed by one of defendant's coconspirators. Under such state of facts, however, the court should have specifically charged the law of conspiracy applicable thereto, and an instruction that if the killing of deceased was the reasonable and proximate result and in furtherance of the execution of the agreement was insufficient.

**3.—Same—Separate Acts of Coconspirators.**

After a conspiracy is once formed, all prior acts or declarations of co- conspirators made in pursuance of the conspiracy are admissible in evi- dence; not, however, for the purpose of establishing conspiracy in the first instance, and the court should instruct the jury that they are not to con- sider separate and individual acts of other conspirators against defendant until the conspiracy is established beyond a reasonable doubt.

**4.—Same—Particular Conditions of Homicide Should Be Charged.**

Where the testimony tended to show that a sudden difficulty ensued between defendant and another at whom he shot, when none of defendant's alleged coconspirators or the deceased were present, and which tended to show the absence of any prior agreement or conspiracy existing between defendant and such others, who afterward were all involved in the said difficulty and which resulted in the killing of the deceased, the court should have clearly defined defendant's rights, directing the attention of the jury to the particular conditions which authorized them not to hold the defendant responsible for the acts of others who actually slew the deceased.

Appeal from the District Court of Shelby.   Tried below before Hon. Tom C. Davis.

Appeal from a conviction of murder in the second degree; penalty, imprisonment in the penitentiary for twenty years.

The facts are sufficiently stated in the opinion.

*D. M. Short & Sons,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was indicted for the murder of his brother, Will Chapman; and on the trial was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty years.

The record shows that the homicide for which appellant was tried occurred in a difficulty, in which appellant and his father-in-law, Harris Prince, and his brothers-in-law, Jodie Prince, Wiley Prince, and Edgar Prince, were arrayed on one side; and Len Hanks, Will Chapman, Hurday Chapman, and probably J. C. Chapman, the father of the latter two, and the father-in-law of Len Hanks, were arrayed on the other side. The immediate cause that led to the difficulty was a scandalous charge made by Len Hanks against Mrs. Ida Chapman, wife of Ed. Chapman, who was also the daughter of Harris Prince. This was occasioned by a report which appears to have been circulated by Mrs. Ida Chapman in regard to an undue intimacy between Miss Lou Chapman and Len Hanks. When this report reached Hanks he traced it, as he thought, to Mrs. Ida Chapman, and he then charged her with undue intimacy with one Dutch Wheeler, which occurred sometime previous to her marriage with Ed Chapman. It appears that after these charges were made by Len Hanks and conveyed to appellant; appellant demanded proof; and on Sunday night, preceding the difficulty on Tuesday, some effort was made by Len Hanks to substantiate what he had said about Mrs. Ida Chapman. Appellant, Hanks and Will Chapman went to certain persons in the neighborhood in order to convince appellant, among others to one Boque. It appears that at first appellant became satisfied of the truth of the charge, and determined to leave his wife. Subsequently, sometime during Monday, he seems to have changed his mind; and he and Jodie and Harris Prince demanded further proof on the subject, and by agreement with the other parties they were to meet on Tuesday morning early at a certain place one or two hundred yards from Len Hanks, who lived about 200 yards from J. C. Chapman. Harris Prince at the time lived about a mile from Chapman. It appears from some of the evidence that appellant Ed-Chapman made up his mind on Monday not to leave his wife, and on that night he stayed at his father-in-law's (Harris Prince), where his wife was. During Monday evening and night it is also shown that Wiley, Jodie and Edgar Prince busied themselves in procuring arms for the meeting on Tuesday, assigning to the parties from whom they procured the guns some other reason than the intended meeting, for instance, that they wanted the guns to go hunting, etc. It is also shown that appellant and those with him stated their purpose in going to the rendezvous on Tuesday was to receive

further proof of Mrs. Ida Chapman's infidelity, and after they had heard what the parties said, to carry the matter into the courts. In this connection Jodie Prince is shown to have stated, when one of the parties said, "You had better drop the matter," that he replied, "No, they would not; if Ida was guilty she had to bear it, but if she was innocent the matter would be prosecuted." However, Will or Hardy Chapman, the other party, in reply said, when they came the next morning, they had better come with their fighting clothes on. To which he replied that he always wore his, and he guessed the others did, too. On Tuesday morning, about 7 o'clock, Harris Prince and appellant Ed Chapman, went over to J. C. Chapman's, walking through the field. Jodie, Wiley and Edgar Prince went on horseback by the road. All these parties were armed with guns or pistols. Harris Prince, after arriving at Chapman's, together with appellant, went down into the field where Len Hanks, his wife and Miss Lou Chapman were working. Hanks states that at this time appellant drew his gun on him and attempted to shoot him, but Harris Prince interfered and told him to hold up until they got all of them together. These parties went on to the house. En route Harris Prince inquired for J. C. Chapman, and went by the smokehouse where he was mending a backband. The other parties proceeded to the house. Hanks went into the house and got a shotgun, took out the shells loaded with small shot and replaced shells loaded with buckshot, placing other shells in his pocket. He then came out, and all sat down on the gallery; that is, Len Hanks and Miss Lou Chapman sitting on the steps together; appellant, Ed Chapman, sitting to the north and beyond the steps and Mrs. Hanks standing nearby him on the ground. In the meantime Jodie, Wiley and Edgar Prince reached the rendezvous, which was some 100 or 200 yards distant. They were waiting there when Will Chapman came by. He invited the party to come on to the house. They said they were at the place where they agreed to wait, and they would stay there until the other parties came. Will remarked that he would then go on and bring Hanks up. About this time it appears the difficulty which precipitated the combat began at the house. While appellant and Hanks were sitting on the gallery Hanks remarked, with reference to the alleged report, that he (Hanks) had been intimate with Miss Lou Chapman (appellant's sister); that appellant ought to take it up as much as he or anyone else. To which appellant replied, "I ought, ought I?" and immediately drew his gun and attempted to shoot Hanks. The gun was knocked up by Mrs. Hanks, and the load struck the roof of the house. Hanks then fired at appellant. In the meantime Will Chapman arrived at the house and, according to defendant's evidence, immediately engaged in the difficulty. About this time Harris Prince and J. C. Chapman came up. Harris Prince, according to some of the evidence, fired at and killed Will Chapman. As soon as Jodie, Wiley and Edgar Prince heard the firing they came up on their horses in a gallop, and engaged in the difficulty, the firing in the

45 Crim.—31.

meantime continuing between the parties already there. According to the testimony of appellant, as soon as Wiley Prince came up, Will Chapman began firing at him, Wiley returning the fire, shooting twice at Will Chapman and killing him. While this was going on Hanks was retreating, and appellant, Jodie and Edgar Prince were firing at him. As Hanks came out of the gate he fired at Jodie Prince, shooting him down. Appellant still pursued Hanks, they firing several other shots at each other until Hanks made his escape. In all some twenty shots were fired by both sides. As a result Len Hanks was severly wounded, Will Chapman was killed dead on the ground; Jodie Prince and Mrs. Len Hanks both received mortal wounds, from which they subsequently died. The State's theory was that the killing of Will Chapman was in pursuance of a conspiracy previously entered into between appellant and the Princes on the one side to arm themselves, and under pretense of seeking a peaceful solution of the trouble in regard to the alleged slander against Mrs. Ida Chapman, they agreed to meet Hanks and the Chapmans at the appointed place on Tuesday, and there precipitate a difficulty and kill Hanks, and whoever else might interpose to protect him or prevent the accomplishment of their purpose; and that in pursuance of this, appellant Chapman did precipitate and bring on the difficulty with Hanks, and that the subsequent killing of Will Chapman by either Harris Prince or Wiley Prince was within the scope of and the proximate result of said conspiracy to kill Hanks, and that appellant was responsible therefor in the same measure as if he himself had committed the homicide. On the other hand, appellant's theory was that the agreement to meet in the vicinity of J. C. Chapman's on Tuesday morning was made in good faith in order to settle the matter in regard to the slanderous reports against his wife; and that the parties carried their arms in order to protect themselves against any assault or threatened violence on the part of Len Hanks and the Chapmans; but there was no conspiracy to bring on a difficulty in order to kill Hanks and those with him. He further contended that the difficulty between himself and Len Hanks was a casual difficulty, which occurred between them, and although he might have been in fault in assaulting Len Hanks, yet, in the absence of a conspiracy entered into between him and the Princes on the one side to kill Hanks and his brother Will Chapman, should he interfere on behalf of Hanks, he would not be responsible for the killing of his brother Will, by either Harris Prince or Wiley Prince; that this was especially true, since there was no evidence showing or tending to show that he knew Jodie, Wiley and Edgar Prince were on the ground or in that vicinity at the time of the difficulty between him and Hanks, and that the testimony did not show any knowledge on his part that his brother, Will Chapman, was present during the difficulty or engaged in it. This is a sufficient statement of the case and of the theories presented, both for the State and the defendant, in order to discuss the legal questions involved.

On the trial appellant objected to the testimony of Hardy Chapman, to the effect that on Monday evening before the killing of Will Chapman, which occurred on Tuesday morning, he met Jodie Prince and had a conversation with him with reference to the report being circulated about Len Hanks and Lou Chapman; and also in regard to the conduct of his sister-in-law, Mrs. Ida Chapman, and Dutch Wheeler, before she married appellant, Ed Chapman. This conversation, among other things, involved the declaration or statement on the part of Jodie Prince to the effect that if his sister was guilty she would have to bear it, and if she was innocent there was law to protect her; that he told Joe Prince to meet him and Will and Len Hanks and Lumas Boque and Alf Meadows on the hill between his father's and Len Hanks', and that he would prove the charge against Ida, with reference to her conduct with Dutch Wheeler. That Jodie Prince agreed to meet them there, stating that he did not want to have any trouble about it, but that he wanted to hear what the proof was, and that he intended to prosecute the parties making the charge; that as he left, witness told him that he had better come with his fighting clothes on, and he remarked that he always wore his, and he supposed his father and Wiley did the same. The State also introduced the testimony of Mrs. Ora Gillespie, and among other things proved by her that Wiley Prince had been working for her some time previous to the homicide, and on the night before the homicide came to her house, which was some three miles from Harris Prince's, about 9 o'clock and that Edgar Prince came with him; and that Wiley borrowed a shotgun, telling her he wanted it to go fishing. The State also proved by Marian Crawford, among other things, that on Monday night, before the killing of Will Chapman, Wiley Prince came to his house with Edgar Prince, and borrowed a 41 Colt's pistol; that he lived about two miles from Harris Prince. And the State also proved by Frank McKenzie that late in the evening of Monday, before Will Chapman was killed on Tuesday, Jodie Prince came to the mill where he was at work and got a pistol from Oren Prince, and told witness to tell the mill man that he could not be there the next morning according to promise. All this testimony was objected to on the ground that these acts and declarations of Wiley, Edgar and Jodie Prince were made in the absence of appellant, and were not binding on him, inasmuch as no conspiracy had been shown on the part of said persons in connection with appellant to kill or injure Len Hanks or Will Chapman, and that thereafter at no time did appellant enter into any agreement with anyone to kill or injure said Hanks or Chapman or anyone else. In connection with this bill, the statement of facts is referred to, and the proposition announced that neither the bill of exceptions nor statement of facts show any conspiracy, either before or at the time of the homicide, was formed between said parties to take the life of either Len Hanks or Will Chapman. We have examined the record carefully with respect to this question, and, in our opinion, there is some testimony,

both before and at the very time of the homicide, tending to show a conspiracy to take the life of Len Hanks, or of any other person who might side with him and interfere on his behalf. And, as we understand the rule of law, after a conspiracy has once been shown between parties to commit an unlawful homicide, all prior acts, or declarations of the coconspirators, though made in the absence of one of the parties being tried for the offense, is admissible in evidence, if such act or declaration was made in pursuance of the common design or conspiracy to commit the murder. Smith v. State, 21 Texas Crim. App., 107; Harris v. State, 31 Texas Crim. Rep., 415; Stevens v. State, 42 Texas Crim. Rep., 157.

Appellant objected to a number of sections of the charge of the court, and asked several charges which were refused; and this action of the court is assigned as error. Among other things appellant objects to the court's charge on principals, insisting that the only proof with regard to the killing of Will Chapman showed that he was killed by either Harris Prince or Wiley Prince; that there was no evidence showing appellant knew his brother, Will Chapman, was present, and that a bare charge of the court on the doctrine of principals did not properly present to the jury the issues arising in this case, inasmuch as appellant could only be bound by the acts of Harris or Wiley Prince on the doctrine of a conspiracy formed to take his life. The court's charge defined what it took to constitute principals, and then instructed the jury, in substance, that if appellant and Harris and Wiley Prince and others agreed beforehand to take the life of Will Chapman, and that in pursuance of such agreement they went to the place of the homicide and unlawfully shot and killed Will Chapman, to find him guilty of murder upon express or implied malice as before defined. The court further instructed the jury, if said parties agreed beforehand to unlawfully kill Len Hanks, and if in pursuance of such agreement, appellant and Wiley Prince went to the scene of the killing, and that defendant, in pursuance of such agreement, unlawfully assaulted Len Hanks by shooting at him with a gun; and if the jury further find that Will Chapman appeared on the scene of the difficulty while the same was in progress, and that Harris and Wiley Prince, or either of them, unlawfully shot and killed Will Chapman while defendant was still unlawfully assaulting Len Hanks, and that the killing of Will Chapman was a reasonable and proximate result, and in furtherance of the execution of the agreement to unlawfully kill Len Hanks, then defendant would be guilty of the same degree of offense of which either Harris or Wiley Prince would be guilty in the killing of Will Chapman. The court further instructed the jury in this connection that, if they had a reasonable doubt that Harris and Wiley Prince, one or both of them, unlawfully killed Will Chapman, to acquit defendant; and in determining whether the killing was lawful or unlawful, he instructed the jury if Will Chapman shot at Wiley Prince on the occasion in ques-

tion before Wiley shot at him, if you find that he did, then to acquit defendant.  Or if Will Chapman shot at Wiley Prince on the occasion in question before Wiley Prince or Harris Prince shot at him (Chapman), then Harris Prince had a right to shoot and kill him, and if the killing occurred in this manner to acquit defendant.  Or, if Will Chapman made any demonstration that caused either Wiley Prince or Harris Prince to believe that Wiley Prince was in danger of life or serious bodily injury, and they shot him on said account, they should acquit defendant.  He also instructed the jury, if Len Hanks first shot at defendant, then defendant had a right to shoot Hanks, and if while he and Hanks were engaged in the conflict Will Chapman appeared on the scene and was killed by Harris or Wiley Prince, to acquit defendant, unless the jury find that appellant had agreed beforehand to kill Will Chapman, and in that event they could not acquit appellant but he would be guilty, even though Hanks shot at him first.

It may be here stated that there was no evidence in the case showing that appellant shot and killed his deceased brother, Will Chapman, or that he knew he was present at the time the difficulty occurred; and the first portion of said charge was not necessary under the facts of this case.  However, there is testimony tending to show that there was an agreement beforehand on the part of appellant and Harris and Wiley Prince to assault and kill Lee Hanks; and it may be conceded that there is testimony tending to show that this agreement or conspiracy embraced any person who might interfere to prevent the execution of their design; and this, of course, would embrace deceased, Will Chapman.  So, if the charge in that section, to wit, "If you find that the killing of Will Chapman was the reasonable and proximate result, and in furtherance of the execution of the agreement," sufficiently presented to the jury the issue that they were to determine; that is, that they understood from said charge they must find that the agreement or conspiracy to kill said Hanks embraced Will Chapman, or anyone else who might interfere to prevent the execution of their design, then said charge in that respect was sufficient.  However, we believe it would have been better if the court had more specifically instructed the jury upon this critical issue, that the design to kill Hanks on the part of appellant and his coconspirators must have embraced within its scope the deceased, Will Chapman.  They may not have understood from the instruction given that the court meant by "reasonable and proximate result," and "in furtherance of the execution of the agreement," that the purpose and design of appellant and his coconspirators must have embraced Will Chapman, before appellant could be found guilty of an act done by either Harris or Wiley Prince.  In other words, we believe appellant's rights would have been better safeguarded had the court, in addition to the charge given on principals, instructed the jury on conspiracy, defining the same, and told them, in effect, if appellant entered into a conspiracy with Harris and Wiley Prince to unlawfully

kill Len Hanks, and as a part of the conspiracy it was also agreed that, if Will Chapman or anyone else should interfere in their design and should endeavor to prevent them from carrying out their purpose to kill him, then, if in the execution of said design either Harris or Wiley Prince killed deceased, Will Chapman, appellant would be guilty.

Appellant further complains because the court failed to give special instruction requested by him. This instruction told the jury how to regard the acts and declarations of appellant's alleged coconspirators made before the homicide, and not in his presence. The testimony to which this requested charge had reference has already been treated in appellant's first bill of exceptions. We there held that the testimony was admissible, although made in the absence of appellant, on the theory that there was testimony tending to establish a conspiracy, and that these isolated and individual acts of the alleged coconspirators were admissible in evidence. The requested charge was not entirely accurate, in that it undertook to eliminate the acts and declarations of alleged conconspirators, so far as appellant was concerned, that were made or done prior to the formation of the conspiracy. We understand the rule to be that, after a conspiracy is once formed, all prior acts or declarations of coconspirators, made in pursuance of the conspiracy, are admissible in evidence. They are not admissible, however, for the purpose of establishing conspiracy in the first instance; and when such acts and declarations are admitted in evidence, it is the duty of the court to instruct the jury in regard thereto. For instance, that they are not to consider such separate and individual acts of other conspirators against defendant for the purpose of establishing a conspiracy as to defendant, but if they believed that defendant entered into a conspiracy for the purpose of unlawfully killing Hanks, and in which the killing of Will Chapman was also embraced, then they could consider the separate and individual acts of such coconspirators as evidence against appellant. See Harris v. State, 31 Texas Crim. Rep., 411; Stevens v. State, 42 Texas Crim. Rep., 154. It was also incumbent on the court in this connection, as requested by appellant, to instruct the jury in case they had a reasonable doubt as to the establishment of a conspiracy between appellant and said coconspirators, to reject all of the individual acts and declarations of such persons.

Appellant also requested the court to instruct the jury with reference to the rights of appellant in case they believed that no prior conspiracy had been formed between him and Harris and Wiley Prince to kill Len Hanks, embracing Will Chapman. Appellant's contention being that there was no such agreement; that the only purpose of the other parties going to that vicinity was to hear what Hanks had to prove with regard to slanderous reports concerning appellant's wife, and that said parties who made such reports were to be prosecuted for slander; that he (appellant) went to the house of Chapman, where Hanks was, and had some conversation there, in which Hanks denounced the person

who had uttered the report against him and Miss Lou Chapman as a liar. Appellant understood this to allude to his wife, as the reports were attributed to her. A sudden difficulty ensued between him and Hanks, in which he shot at Hanks. None of his alleged coconspirators were present at the time, nor was Will Chapman. In the face of this testimony we believe the court should have clearly defined appellant's rights in the absence of any prior agreement or conspiracy existing between him and Harris and Wiley Prince to take the life of Hanks or Will Chapman; that is, if there was no conspiracy which in its scope embraced the taking of the life of Will Chapman, and appellant had a difficulty with Len Hanks, in which he was the aggressor, yet if Will Chapman, during the progress of the difficulty, came upon the scene, and Harris and Wiley Prince also came, and they engaged in the difficulty on their own account, and not because of any pre-existing agreement with appellant, and in such difficulty Harris or Wiley Prince slew deceased, Will Chapman, then and in such event appellant would be guilty of no offense. True the court did charge that if Will Chapman fired the first shot at Wiley Prince, or made some demonstration which caused him or Harris Prince to believe that the life of said Wiley Prince was in danger, then, if either killed the said Will Chapman, appellant would be guilty of no offense. But this charge, though broad enough, did not in terms direct the attention of the jury to the particular conditions which authorized the jury not to hold appellant responsible for the acts of Wiley and Harris Prince. Guffy v. State, 8 Texas Crim. App., 187; Rhodes v. State, 39 Texas Crim. App., 332.

There are other questions in the case, but it is not necessary to discuss them. For the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*