## CATHERINE M. SMITH v. THE STATE.

### No. 2699. Decided June 25, 1904.

**1.—Evidence—Conspiracy—Statements of Coconspirators.**

On a trial for murder, where the evidence shows a conspiracy between defendant and another party to commit the crime, the acts and declarations and threats of the coconspirators prior to the killing, though made in the absence of defendant, before the conspiracy was formed, are admissible in evidence against defendant to show the animus, object and purpose actuating the defendant in the commission of the crime.

**2.—Same—Time of Entering Conspiracy Immaterial.**

On a trial for crime, where the evidence shows a conspiracy, it makes no difference at what time anyone entered into the conspiracy to commit the crime; everyone who entered into the common purpose and design is gnerally deemed a party to the act which has been before done by the others and to every other which may afterwards be done by any of the others in furtherance of such common design.

**3.—Charge of the Court—More Favorable than Law Permits.**

A charge which submitted to the jury the questions of fact as to whether or not a conspiracy existed between defendant and another, at the time said acts and declarations occurred, and if there was not such a conspiracy, to disregard said testimony, was more favorable to defendant than the law permits, as the conspiracy might have been formed after such acts and declarations.

**4.—Evidence—Subsequent Experiments.**

In the absence of evidence in the record to show that appellant knew of the resisting power of the sacks of grain to bullets fired therein and of declarations of any of the codefendants indicating that they knew of such power of resistance, it was error to permit the testimony of a witness that after the homicide he fired into one of these sacks of grain and the bullets did not go through these sacks.

**5.—Evidence—Animus of Defendant.**

Where defendant, on trial for murder of a deputy sheriff, had testified that when the officer dispossessed her the first time that he was kind and considerate and did not hurt her in putting her off the place; it was competent for the State in rebuttal to show by a physician who treated her shortly after said first eviction, and a few weeks before the same officer attempted to dispossess her and her husband a second time, defendant's animus toward deceased, by statements made by defendant to witness at that time, and that he attended to injuries which defendant then claimed the deceased had inflicted upon her.

**6.—Evidence—Material Testimony—Documents.**

Where a judgment of foreclosure against defendant and her husband's land had been obtained and execution suspended until default of the payment of certain interest thereon to the purchaser of said judgment, it was permissible for the State to show that such contingency had occurred by the introduction of certain instruments in writing to show that the order of sale and writ of possession under said judgment and which the deceased attempted to enforce were not prematurely issued by the terms of such instrument.

**7.—Evidence—Advice of Counsel.**

Where appellant was tried for murder for killing an officer who attempted to dispossess her and her husband of land by virtue of a writ of possession, it was proper to exclude the advice of counsel to the effect that under certain contingencies defendant could use force against force in order to maintain possession of the land.

**8.—Evidence—Criminal Intent.**

Where the State proposes to show criminal intent against one procuring arms, appellant can show that his criminal intent, if any, was against another and different party and can explain why he secured the arms and what he intended to do with them.

**9.—Evidence—Self-Serving Declarations.**

Declarations and exclamations of defendant long after the homicide are not res gestae and self-serving, and therefore inadmissible in evidence.

**10.—Bill of Exceptions—Too General.**

An objection that the charge of the court taken as a whole is erroneous, etc., is too vague and general to be reviewed.

**11.—Charge of the Court.**

Where the court charged, "and in case you believe beyond a reasonable doubt that the defendants conspired to resist any officer in the execution of the writ of possession read in evidence, then it would be immaterial, whether they had any personal animosity, or cherished any malice toward deceased," there was no error.

**12.—Charge of the Court—Writ—Functus Officio.**

Where a sheriff dispossessed appellant under a writ of possession and thereafter the latter reoccupied the premises and the officer was killed by appellant, her husband or her son, who conspired to resist said second eviction, while attempting to evict appellant under said writ, it is held that said writ was a valid legal process and not functus officio. Davidson, Presiding Judge, dissenting.

**13.—Charge of the Court—Conspiracy.**

It was error on part of the court on a trial of murder by conspiracy, not to instruct the jury that they could not consider the acts and declarations of appellants' coconspirators for the purpose of proving a conspiracy, but that they must believe from the evidence, beyond a reasonable doubt, that the conspiracy was formed, before they could consider said acts and declarations.

**14—Charge of the Court.**

Where the evidence did not show that the officers used excessive force, it was not error to refuse a charge on this phase of the case.

**15.—Evidence—Conspiracy—Husband and Wife.**

Where it was shown that appellant's husband had procured arms which were used in the homicide and had made declarations with reference thereto, the fact that he was appellant's husband would not preclude his acts and declarations as evidence against the wife where he had entered into the conspiracy with her to commit the homicide. Davidson, Presiding Judge, dissenting.

**16.—Evidence—Subsequent Rent Contracts Immaterial.**

Rental contracts which were made subsequent to and dependent upon the order of sale and writ of possession, were properly excluded, as not affecting the validity of the latter.

**17.—Evidence—Homestead—Validity of Writ.**

There was no error in admitting, over the objection of defendant, the written designation of the homestead to show a valid foreclosure on the land where the homicide occurred for which appellant was being tried.

Appeal from the District Court of Bell. Tried below before Hon. John M. Furman.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*John B. Durrett* and *R. B. Seay,* for appellant.—The court, in paragraph 22 of its charge instructs the jury that if they believe from the evidence beyond a reasonable doubt that a conspiracy existed between the defendant and T? E. Smith, then they may consider the evidence of the acts and declarations of T. E. Smith, and the said charge wholly omits to instruct the jury that they must find the existence of the conspiracy from the other evidence in the case before they can consider the acts and declarations of T. E. Smith for any purpose. The meaning and import of the charge as given to the jury is that they must take all the evidence in the case, including the evidence of T. E. Smith's declarations and acts, and from the same decide whether or not a conspiracy existed, and if they decide that a conspiracy existed, then they may consider the acts and declarations of T. E. Smith as though they were the acts and declarations of defendant.

The evidence of the acts and declarations of T. E. Smith was admissible but for a single purpose, that of throwing light upon the motive, intent and animus of the defendant at the time of the homicide, and it was admissible for that purpose only upon the condition that the other evidence in the case showed the existence of a conspiracy between defendant and T. E. Smith at the time acts and declarations occurred.

The said acts and declarations were not admissible under any circumstances for the purpose of showing the existence of the conspiracy and could not become so, and it was clearly the duty of the court to instruct the jury as to the purpose for which the said testimony was admitted, and to instruct them to limit the same to the purpose for which it was admitted, and to exclude it from their consideration of the question as to the existence of a conspiracy. Chapman v. State, 8 Texas Ct. Rep., 394; Stevens v. State, 42 Texas Crim. Rep., 154; Blain v. State, 33 Texas Crim. Rep., 236; Cox. v. State, 8 Texas Crim. App., 254; Loggins v. State, 8 Texas Crim. App., 434; Kennedy v. State, 19 Texas Crim. App., 618; Smith v. State, 31 Texas Crim. Rep., 120.

The record shows conclusvely that Brooker had bought the judgment

of the Union Central Life Insurance Company, and Harris had bought the lands from the Smiths. By an agreement entered of record (of which the officers had full notice) Harris, with Brooker's consent, had leased the lands occupied by T. E. Smith and family to T. E. Smith for the years 1902 and 1903. Neither Brooker, nor Harris, nor both together could evict Smith until the end of 1903, and these two owned every vestige of right to the land as well as to the judgment. The two owned all rights and powers both as to the control of the judgment and the land; and both had given Smith a contract by which he could hold the land and house so rented for the year 1903 as against the whole world. If neither of them nor both of them could eject Smith, then they surely could authorize no one else to. Hence when the land was sold all the officers could do was to turn over the deed and the tenants in possession to the purchasers. This would place the purchaser in possession of the premises.

It is elementary that when a tenant leases for the year he buys for the year, and if he has a good title he can not be evicted. Brumly case, 12 Texas Crim. App., 609; Elliott case, 39 Texas Crim. Rep., 242; Taylor's Landlord and Tenant, sec. 304; Tiedeman on Real Prop., sec. 190; 12 Am. and Eng. Enc. of Law, p. 696.

To the same effect it is held in Texas that when a lessee for a term of years enters into possession of land, and the lessor after the execution of the lease parts with the title of the land by sale, the lessee by operation of law becomes the tenant of the vendee, and adverse possession by such lessee of the land inures to the benefit of the vendee. Davidson v. Wallingford, 88 Texas, 619; Hearne v. Lewis, 78 Texas, 276; Porter v. Sweeney, 61 Texas, 213.

A landlord reserving a specific interest in the crop is a joint owner with the tenant of the crop and does not merely hold a lien for rents. Horsley v. Moss, 23 S. W. Rep., 1115.

The court erred in admitting in evidence over the objections of defendant, the testimony of S. M. Dodd, Tom Alexander, George C. Pendleton, A. J. Owens, J. E. Sparks, J. W. Hunnicutt, I. C. Bradshaw and William Taylor as to the acts and declarations of T. E. Smith, the husband of the defendant. Chapman v. State, 8 Texas Ct. Rep., 394; Cox v. State, 8 Texas Crim. App., 254; Loggins v. State, 8 Texas Crim. App., 434; Kennedy v. State, 19 Texas Crim. App., 618; Smith v. State, 31 Texas Crim. Rep., 120; Blain v. State, 33 Texas Crim. Rep., 236.

*Howard Martin,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant, Catherine M. Smith, was jointly indicted with T. E. Smith (her husband) and Addison Smith (her son) for the murder of I. B. Grubbs, deputy sheriff, on the 6th of August, 1903. Appellant was granted a severance, and upon trial was con-

victed, her punishment being assessed at twenty-five years in the penitentiary for murder in the second degree.

The evidence adduced is substantially as follows: Appellant and her husband were joint defendants in a civil suit foreclosing a mortgage lien upon their property, in favor of the Union Trust Company. After the mortgage was foreclosed, one Brooker had the judgment transferred to himself. Subsequently the property, so far as the interest of defendant and her husband was concerned, was transferred to A. J. Harris, in trust, to secure a loan to pay off the foreclosed mortgage. Harris joined with defendant and husband executing to said Brooker a deed of trust on the growing crops for the year 1903, stipulating that the mortgage lien should not be affected in any manner whatever, and on failure to comply with the stipulations of said last instrument, Brooker had the right to foreclose the mortgage as per the terms of the judgment. Harris, defendant and husband failing to comply with the terms of the instrument they executed to Brooker, a writ was issued on the judgment, properly advertised, sale made, and Brewster Bros. bought the land upon which the homicide occurred. On July 16th, the deed having been made to the said Brewsters, or rather to their vendee, Hall, Brewster had the officers Ike Grubbs and J. E. Sparks, deputy sheriffs, to go to the premises and put appellant and husband off of the same, being for the benefit of said Brewsters and Hall. The officers left some effects upon the premises—a hog, some grain in the shock, chickens, and perhaps a few other articles. This act was performed by deceased (Ike Grubbs) and J. E. Sparks, deputy sheriffs of Bell County. On the next day after the Smiths were ousted of the premises, they returned and took possession of the house upon the land in controversy. On August 6, 1903, deceased and Sparks returned to the premises to dispossess the Smiths by virtue of the same writ under which the former dispossession took place, having the writ in their possession at the time. Five wagons had preceded them to the home of defendants, and a short while after they arrived there the officers above named came up. While one of the officers was hitching the horses they having come in a buggy) appellant's husband approached deceased, stating he came out "under a flag of truce." Deceased informed him he would have to dispossess him anew, and appellant's husband protested against this, saying he thought, and had been informed by his lawyers, that the writ of possession could not be used the second time for that purpose. After some parleying over this question, the officers got between appellant's husband and the house, and deceased (Grubbs) started towards the door of the cottage, the husband following and attempting to get into the house before the officers. Sparks caught T. E. Smith and detained him and at this juncture Grubbs entered the house. He opened the screen door and it slammed behind him. In a few moments a gunshot was heard, and then another shot. Sparks drew his pistol—T. E. Smith being behind

him—and when he attempted to draw his pistol Smith grabbed it, and Sparks hallooed, "Ike! Ike!" (being the given name of deceased officer). No answer came in reply to this call. At this juncture appellant and her son Addison came out on the gallery, appellant with a shotgun and her son with a rifle. Appellant remarked, "I told you I would fight for my home." She demanded of Sparks that he turn her husband loose. The husband replied, "Don't shoot; you will shoot me." After some colloquy between Sparks and T. E. Smith, Smith turned Sparks' pistol loose. Sparks asked appellant if Grubbs was dead. She replied that he was, and that he (Sparks) would be dead if he did not get away from there. The State proved by various witnesses that T. E. Smith, after the first dispossession, secured a magazine shotgun, another shotgun, and a 32 winchester rifle. These were in the house at the time of the homicide. The house consisted of four rooms, fronted east, two rooms in front, and immediately back of these two more, with a gallery in front nearly the whole length of the house. The killing occurred in the southeast room, which was about fourteen feet square. There was a door in this room, leading on to the gallery, and also a window opening on the gallery; a door in the south end of the room, and a door in the partition between the two front rooms. There was a table somewhere near the center of the room, and a bed in the southeast corner. To get to the window opening on the gallery it would be necessary to be on the bed. Sparks testified that he saw defendant, Addison Smith, on the bed just before the shooting.

The only eye-witness to the shooting were appellant and her son Addison. After detailing the coming of the officers and other matters substantially as stated, Mrs. Smith testified: "When I saw the officers approaching, I said to Mr. Smith and Mr. Sanders, 'There are the officers now.' Mr. Sanders and Mr. Smith went down to where they were at a point southeast of the house a short distance. I sat down on the bed by my boy, and in a little while I noticed that Mr. Sanders was not with them any more; and I got up and went to the south window and looked out to see if I could see where he was. I then walked back to the door and saw Mr. Smith and the officers standing down by the front fence talking. I then walked back to the window and back again to the door. When I got back to the door I saw the officers running around keeping Mr. Smith from coming to the house. It looked to me like they were trying to catch him. This frightened me, and I ran to the east window so that I could see out of the east window from the bed; and when I got there I saw Mr. Sparks and Mr. Smith close up to the gallery, south of the steps, and Mr. Sparks had a pistol in his hand and Mr. Smith grabbed it. I thought at first it was a pair of handcuffs they were trying to put on him. In an instant I saw it was a pistol, and that Mr. Smith had caught it by the barrel. When I saw this I started at once to the door to get out there. When I got pretty well to the foot of the bed, Mr. Grubbs rushed in at the door and took a

step toward me. I did not see him open the screen door. He rushed in right on me. I was not looking for him. When I saw him start toward me, I threw up my hands, and said, 'Don't you touch me; don't put your hands on me.' About this time he saw a gun that was lying on the table, right close to the foot of the bed and to my right, and started for it. When he started for the gun I grabbed it, and he sort of stepped and caught me and the gun; and we commenced scuffling over the gun. He tried to take the gun away from me and I held on to it, and he forced me back against the wall, near the north partition door, and the gun went off between us, and he fell to the floor and dragged me with him. I fell over the back of a rocking chair, west of the partition door. I was terribly frightened and struggled up, and stood against the partition wall and looked down at him. I saw he was dead. I saw the wound in his head, the blood spurted from it, and brains were scattered on the floor. I saw particles of his brains about the size of a piece of lead pencil spattered on the front of my dress, on my breast. I tried to brush them off. At the time I told Grubbs not to touch me, his face looked so angry. He had been so kind and good to me when he was there before that I hardly knew him the way he looked when he started to me. I did not point the gun at him, or attempt to shoot with it. I did not have time to do anything with it, he caught me so quick. The moment he caught the gun he commenced trying to take it away from me, and I was holding on to it with all my might. My son Addison was lying on the bed with his head towards the window the last time I saw him before Grubbs came in the door. I do not know what he did when Grubbs came in the room, or what he did while we were struggling. I have no recollection of getting a gun and going out on the gallery and ordering Mr. Sparks to turn my husband loose. I heard all the testimony in this case and heard the testimony on habeas corpus trial, and I feel sure from what I heard that I went out on the gallery and that I had the gun as they say I did, but I have never been able to recollect anything more than I have told. I did not have any malice or unkind feelings toward deceased or Sparks when they came out there that morning."

This is the substance of the defense testimony in reference to the killing; there are some minor details which we do not deem necessary to state. The undisputed evidence on the part of the State is that deceased was killed with a shotgun, part of the buckshot having been found in his head and part of the wadding of the gun. The proof also shows that the discharge from the winchester in the scuffle detailed by Mrs. Smith went in the wall about four feet from the floor, and evidently did not cause the death of deceased. The entire side of deceased's head was shot off, and his brains were scattered on the floor.

There are fifty-three bills of exception in this record. We will dis-

cuss those which we deem necessary for a proper disposition of this case.

By bill of exceptions number 1 the State was permitted to prove by the witness S. M. Dodd, over appellant's objection, the following: "I know these guns here. This Winchester rifle belongs to my stock. I remember the circumstance of Grubbs being killed, about the 6th of August last. Before that time I rented these guns to T. E. Smith. He got the Winchester rifle on the 5th of August, and the magazine shotgun on the 23d of July. The day he got the rifle, when I went in the store Alexander was waiting on Mr. Smith, and was having some trouble loading the gun. Mr. Smith asked me how many cartridges it carried, and I looked in the catalogue and told him it carried fifteen in the magazine and one in the chamber. I asked him if he was going to carry it out loaded, and we were laughing and joking, and he said he was going to take it out to the farm and kill some jack-rabbits and bring their ears in to vote the prohibition ticket. I do not know whether he was a pro or an anti. As well as I can remember it was about 3 or 4 o'clock in the evening of August 5th." Appellant objected to this testimony on the ground that said acts and declarations of T. E. Smith were made in the absence of defendant, and there is nothing shown for her to be in any way responsible for them; because at the time of making said declarations and said acts he was the husband of deceased, and to prove the same against defendant is in effect using the husband of defendant as a witness against her; and because said acts do not appear to have been done or declarations made pending any combination between T. E. Smith and defendant, or any other person, to take the life of any officer who attempted to execute the writ of possession; and do not appear to have been made in pursuance of such conspiracy; and because evidence aliunde of acts and declarations of said Smith wholly fails to show or even make a prima facie showing that there existed at the time thereof any combination or conspiracy between said Smith and defendant or any other person to kill deceased or to resist any officer who might attempt to execute the writ of possession; and because it appears from the evidence at the time said acts were done and declarations made no conspiracy was in existence; and because said Smith had no idea at the time that any attempt would be made to remove him from the premises under the writ, but was informed that the dispute over the premises would be settled by a law suit in court. The court appends this explanation: "The record showed that defendant and T. E. Smith were jointly indicted and severed at the request of defendant, with the consent of T. E. Smith. The court submitted to the jury, as a question of fact, whether or not a conspiracy existed between defendant and T. E. Smith at the time said acts and declarations occurred, and if there was not such a conspiracy then to disregard said testimony." It is immaterial whether the conspiracy was formed at the time the acts and declarations of Smith were com-

mitted or not. If it was subsequently formed, this was a question of fact for the jury to determine. The fact that he was the husband of appellant would not preclude him forming a conspiracy to take the life of the officers. This being true, his acts and declarations would be admissible against him, as well as defendant. We think the evidence in this case clearly shows, from the State's standpoint, that there was a conspiracy. And the evidence introduced by appellant indicating that she and her husband did not think the officer would attempt to again execute the writ, would not preclude the introduction of this testimony, but could only go to its weight or credibility.

Appellant's bill number 2 complains of the introduction of the testimony of Tom Alexander, practically upon the same question.

The third bill complains that the court permitted Geo. C. Pendleton, to testify: "I had some conversation with Mr. and Mrs. Smith about the land, about the 16th of July—the day before Sparks and Grubbs went out and moved them off the first time. On that day Mr. Brewster, Mr. Warren, and deputy sheriff and myself went out on the place to get the tenants to sign contracts acknowledging tenancy to us, and after we got about all of them to sign contracts acknowledging tenancy to us, we went down to the house occupied by the Smiths. We found Mrs. Smith at home, but did not find Mr. Smith there. I had a conversation with Mrs. Smith. I told her that I supposed she knew we had bought the land at the sale, and asked her if she and Mr. Smith had decided what to do about it. She replied, she did not know what Mr. Smith was going to do, but she knew what she was, but she declined to say what she was going to do. I left and met Mr. Smith in Temple. I told him that we had been out to the place, and was sorry he was not at hime; that we recognized him as a tenant on the place for the year 1903, with the other tenants; that we had gotten attornments from several of the tenants, and were going to get them from the balance; that we did not claim the small grain rent on the place, but as to the growing crops on the place we claimed the rent for the year; that we wanted him to stay on the farm until the end of the year, and all we asked of him was to acknowledge Brewster as his landlord; that we wanted the matter settled amicably. His reply was that this was no proposition; that if I would make him a proposition worth something he would consider it. He said to me, 'You have heard that I claim a homestead out of the land.' I told him that we wanted to settle the matter without trouble, but if we could not do it, that we had a writ of possession to put him off the land. I told him that the sheriff would be out to put him off the land, and I hoped he would be there, and we could manage it without any more trouble to him than was necessary. The next morning I went out with Mr. Austin and Strange to finish up with the other tenants and also with Mr. Smith if he would attorn. I met Mr. Smith between Temple and the land, and stopped and spoke to him. I told him I was going out, and regretted he was not there; and

asked him if he would be back again. I told him I wanted to settle this thing amicably, pleasantly and in a legal way; and asked him if he would be back that evening. He stated he had business in Temple and said, 'I want to warn you now not to go to my house bothering my wife.' I never saw Mr. Smith after that time. He warned me not to go on the place, and I did not go there again." Appellant objected to this evidence on the ground that it was not in the presence of defendant, and the various reasons urged as objections in the first bill. None of these objections are well taken, and the testimony was properly admitted.

By the fourth bill the State proved by A. J. Owens, "that on Saturday, the 18th day of July, 1903, while we were waiting for Mrs. Smith to get ready to go, or while we were waiting for it to get cool enough for her to go, or to take her off, T. E. Smith, Sparks and Grubbs and myself were sitting in the shade on the north side of the house; and I heard Smith do some talking there about being evicted. I heard Smith say that under the same circumstances as this, if it were to do over again, he would sell out, and he said that by sell out he meant, by God, that he would kill or get killed. He said that he had three boys and that he was going to teach them the same thing. That was about all that I heard him say." By the fifth bill it is shown J. E. Sparks was permitted to testify to the same facts as the witness Owens; and he states that Smith, in that conversation, said "he had no hard feelings toward the officers, but that they ought not to put themselves up as targets." By the sixth bill, appellant complains of the testimony of J. W. Hunnicutt, in which he details a long conversation with T. E. Smith, showing animus toward the officers. This last bill is approved with this qualification: "That the court admitted the testimony and in its charge to the jury submitted to them the questions of fact as to whether or not a conspiracy existed between defendant and T. E. Smith at the time said acts and declarations occurred, and if there was not such a conspiracy, then to disregard said testimony. That the record showed defendant and T. E. Smith were jointly indicted and severed at the request of defendant, with the consent of T. E. Smith." To all of this testimony practically the same objections were urged. We hold that, on a trial for murder, where the evidence shows a conspiracy between defendant and another party to commit the crime, the acts and declarations and threats of the coconspirator prior to the killing, though made in the absence of defendant, before the conspiracy was formed, are admissible in evidence against defendant to show the animus, object and purpose actuating defendant in the commission of the crime. We further hold that it makes no difference at what time anyone enters into a conspiracy to commit a crime; every one who enters into the common purpose and design is generally deemed a party to the act which has been before done by the others, and to every other which may afterwards be done by any of the others in furtherance of such

common design. Hudson v. State, 43 Texas Crim. Rep., 420; Stevens v. State, 42 Texas Crim. Rep., 154; Chapman v. State, 8 Texas Ct. Rep., 392, 45 Texas Crim. Rep., 479; Blaine v. State, 33 Texas Crim Rep., 236. It follows, therefore, that the qualification of the court as to the giving of such charge was more favorable to appellant than the law permits. If T. E. Smith made these declarations, subsequently formed a conspiracy with his wife and son to kill deceased and his brother officer, or other parties who might attempt to dispossess him of the premises, then such declarations, though made previous to the formation of the conspiracy, would be admissible to illustrate and make manifest the intent with which the parties were acting at the time of the consummation of the conspiracy. This should be the character of qualification placed upon the testimony by the court in his charge, and he should not have instructed the jury that it would not be considered unless the conspiracy was formed at the time of the declarations and threats.

Bill of exceptions numbers 7 and 8 complain of the introduction of similar declarations of T. E. Smith, as stated in bill number 6. All this testimony was admissible for the purpose above indicated, and the objections urged by appellant are not well taken.

The ninth bill of exceptions complains of the following: "The State introduced J. W. Hunnicutt, and after he had testified to conversations with witness Smith, counsel for State proposed to refresh his memory by reading a statement made and signed by him before the grand jury, and after hearing the statement stated it was correct, and that he knew the statement was correct independent of said written statement, and that same merely refreshed his memory of the facts therein detailed." The bill is quite lengthy and we will not detail it. We do not think there was any error in this.

By the tenth bill, it appears the State introduced Sam Sparks, who testified: "When I went out to the Smith place on the Sunday following the killing, I fired a pistol into one of the sacks of grain that was piled up there on the gallery when Grubbs was killed. The pistol I used was a 45-caliber Colt's. The sacks of oats were the ordinary sacks, such as oats are usually sacked in. When I fired the shots into the sacks of oats, the bullets did not go through the sacks of grain. The pistol I used was the very best pistol made." `In addition to the statement made above, the testimony showed that the sacks were piled up as a barricade against the doors and windows of the house; and the State's insistence was that the same was done as a preparation for resisting the officers. The bill shows that defendant contended, and so testified, that she knew of no agreement or conspiracy to kill the officers or resist them to the extent of taking life, and that the sacks of grain were placed on the gallery and in the back room of the house for the purpose of protecting the grain from the weather and the depredation of stock running in the field where the grain had been threshed, and that neither she nor her husband had any intention of using said sacks of grain for the

purpose of resisting officers. Appellant objected on the ground that it was irrelevant and inadmissible for any purpose, and did not and could not throw any light upon the issue in the case; and did not and could not illustrate the question as to the purpose of defendant and said T. E. Smith in placing said sacks of grain on the gallery and in the house; and because proof of the fact that said sacks of grain were suitable for the purpose of forming a barricade, could not be used for the purpose of proving that the same were used for that purpose. We do not think this testimony is admissible. There is no evidence in the record to show that appellant knew of the resisting power of the sacks of grain to bullets fired therein. There is no declaration of any of the codefendants indicating that they knew of any such power of resistance. It is entirely proper and germane for the officer or any other witness to testify as to the sacks being there, the number, how placed, etc., but subsequent experiments to show how effective the barricade was, would not throw any light upon the guilty intent of the perpetrators of this crime.

By the eleventh bill of exceptions it is shown that Dr. Barton was permitted to testify: "When I made an examination of Mrs. Smith at the hospital in Temple she said something about the officers having put her off of the place and hurt her. I did not find any injury of any sort. She asked me about her suit against the officers for damages, for having put her out and hurt her; and I told her that I did not know anything about that, to consult a lawyer. I don't remember her saying anything about my standing by her in her suit." Appellant objected on the ground that it was a privileged communication between physician and patient; irrelevant, inadmissible and incompetent for any purpose, in this, that the same occurred more than three weeks prior to the time of the homicide, and before defendant had ever returned to the premises where the killing occurred, and before she could have known or contemplated that she would ever return, or that the officers would ever return and undertake to evict her from said premises the second time; that the said declaration of defendant with reference to having been injured could have been in no way connected with the facts and circumstances of the homicide occurring long after; was calculated to prejudice the jury against defendant by leading them to believe that defendant had pretended to be injured by the officer when she was evicted for the first time, when in fact she was not so injured. The court qualifies this bill, as follows: "Defendant took the stand in her own behalf, and testified, among other things, that deceased assisted in putting her out the first time; that he was kind, careful and considerate of her feelings and in no way acted rough or ungentlemanly toward her, and did not make any assault on her to injure her in any way, or attempt to injure her in any way; that she and T. E. Smith went from the farm to the King's Daughters' hospital in Temple; that Dr. Barton attended her. Counsel for State then asked her if at any

time Dr. Barton made an examination of her at her request. To which she replied that he did not. Counsel for State then asked this question: 'At that time and place did you not in substance say to Dr. Barton that the officers had put you out of your home and farm, and in so doing so had hurt and injured you.' To which she replied, that she did not. Counsel then asked, 'Did you not at the same time and place, in substance, say to Dr. Barton after he had told you that he could find nothing the matter with you, 'Well, doctor, what am I going to do about my suit against the officers for putting me out and hurting me?' To which she replied that she had no such conversation. Counsel then asked her, 'If Dr. Barton did not tell her, in substance, that that was a matter he did not know anything about, and that she had better consult a lawyer.' To which she answered, 'No, sir.' Counsel then asked defendant, 'If she did not say, 'Doctor, won't you stand by me in my suit?' To which she answered, that she did not. Defendant also testified that at the time of the homicide deceased assaulted her. The State in rebuttal sought to impeach defendant by placing upon the stand Dr. Barton, and asking him the same questions that were asked defendant, as above set out in the bill of exceptions; and the witness Barton gave answers as set out." This testimony is clearly admissible as indicative of the fact that appellant had animus against deceased for the previous ejection of appellant from the premises and her declaration to the doctor that he (deceased) had hurt her, is clearly admissible to illustrate and show the animus and malice she had toward deceased. Clearly if it was permissible for her to testify that deceased had been kind and considerate in ejecting her from the premises, in order to show to the jury that she had no animus toward deceased at the time of the homicide, it was proper for the State to rebut this by adverse declarations made by her to Dr. Barton.

Bill of exceptions number 12 shows that appellant "offered to prove by J. N. Brooker and A. J. Harris: [It having been proved by the State by instrument in writing that when said Brooker agreed to extend the time for the payment of the judgment against defendant and T. E. Smith, bought by him and assumed by A. J. Harris, as shown by the evidence, that said Harris agreed to pay the interest on said judgment annually, upon the pain of the whole debt becoming due and payable upon default in the payment of the said interest.] The further facts were proved by said witnesses that said Harris made default in the payment of said interest, and that Brooker thereupon declared his option and made the entire debt due, and had his order of sale issued upon said foreclosed lien judgment and the land sold thereunder." Appellant objected to this testimony on the ground that by the purchase of the judgment by Brooker and the purchase of the land upon which the judgment was a foreclosed lien and the assumption of the payment of said judgment by said Harris, and by the contract of extension and the additional security between said Harris and Brooker,

defendant T. E. Smith and Catherine Smith, who were the original defendants in the foreclosure suit, were eliminated from the same; and the order of sale issued upon said judgment at the instance of Brooker did not apply to the Smiths, only as they held under Harris, with the permission and consent of Brooker for the year 1903, and exempt from the operation of said order of sale until their time as tenants had expired; and it was immaterial to them whether the order of sale was issued legally or not; and the said testimony was calculated to prejudice the jury against defendant by leading them to believe that defendant was connected with said Harris in the default of the payment of said notes to Brooker. We have carefully gone over these various deeds, deeds of trust, chattel mortgages, etc., alluded to and recited in this bill of exceptions. They all appear and show upon their face to have been executed subsequent to the procurement of the original foreclosure judgment, which foreclosure judgment was transferred to J. N. Brooker. It also shows that appellant signed legal instruments—the exact verbiage of which we do not deem necessary to state; but to the effect that, if the parties made default in the payment of interest due upon said judgment of foreclosure, Brooker had the right to issue his order of sale, and have the land sold. The clear legal import of said instruments is to this effect; and the facts are undisputed as to the default made by Harris, appellant and T. E. Smith. There is no merit in appellant's contention that she and her husband held under A. J. Harris, since Harris merely held a permissive right to do certain things, which neither of them performed. We accordingly hold that said instruments were properly introduced to show that the order of sale was not prematurely issued by the terms of the collateral agreement.

The thirteenth bill complains that after appellant had introduced A. J. Harris, and he had testified that he was the legal adviser and attorney for defendant and husband in all the business and litigation connected with the foreclosure of the mortgage upon the premises where the homicide occurred, and in the suit in which the writ of possession in this case was issued, appellant then offered to prove by said witness, "That he had bought the equity of defendant and husband in said premises, after the mortgage was foreclosed; and procured Brooker to buy the judgment and extend the time for the payment of same until January, 1904. That witness rented the premises to T. E. Smith for the year 1903. That when the land was sold under the order of sale, T. E. Smith came to witness for legal counsel and advice as to what course for him to pursue in the event of the purchaser of the land attempting to evict from the premises; that he advised them that, if they acknowledged their tenancy to the purchaser of the premises, they would afterwards be estopped from claiming any right to a homestead in the premises; and further advised them that they had a right to the possession of the premises for the remainder of the year 1903, under their rental contract with him, and were entitled to their growing crops upon the

rented premises less the rents for the year 1903, which they would have to pay to the purchaser—even though they failed to establish their homestead claim; that witness advised them when the officers came out at first to evict them, while they had a right to remain upon the premises for the remainder of the year 1903, the fact that they were defendants in the original suit and were named in the order of sale as defendants, would give the officers a right to evict them from the premises, unless they could give an injunction bond, and that there was nothing for them to do but to submit quietly to being put off the place by the officers; that at the time the officers were evicting them from the place the first time witness was on the premises and told T. E. Smith if he could regain possession of the premises peaceably, after the officers had put him off, and put Brewsters in full possession and complete possession of the same under the writ, that he could rightfully hold possession of the same as against the said Brewster until he gathered crops from the premises, or until the end of the year of 1903, and that Brewster would be forced to sue him either for the title of the land or for forcible entry and detainer, and that he could defend his right to the land in that suit. That two or three days after the Smiths were evicted from the premises, witness met said Smith in the town of Temple, and he told witness that he had moved back on the premises and was living there again; that after the officers put him off the place, and put Brewster in possession under the writ, he went back the next morning and found no one on the place and moved back into the house; that witness then advised Smith that he had a right to hold said premises against Brewster until his right to the property was settled by a suit, and that if Brewster attempted to put him off by force, he would have a right to resist force with force; that the witness then advised Smith that the order of sale and writ of possession in the suit for foreclosure was functus officio, and the sheriff had no right to evict him a second time under said writ; and that he would not attempt to do so, and that the only thing he had to watch was to keep Brewster and his friends from catching him off his guard and putting him off the place by force; that if they could get him off and get in possession, he would have no right to take the place by force, but would have to give bond and sue them for the place. That witness warned Smith to be on guard against Brewster and his friends. That witness never at any time before or after the Smiths were evicted from the land on July 20, 1903, advised T. E. Smith to resist the officers or to shoot it out with them if they came to put him off the premises. He advised him that he could not resist for a moment the officers, no matter what their legal rights were."

The bill further shows that the State had introduced the acts and declarations of T. E. Smith for the purpose of showing that Smith and appellant had re-entered the premises for the purpose and with the intention of holding it against any person attempting to evict them,

even though it were the officers acting under said order of sale, to the extent of taking life, if necessary, to hold such possession. On the other hand appellant contends that she knew nothing of such intention on the part of said Smith, and that the same did not in fact exist. But that all the acts and declarations of T. E. Smith were made with refer-ence to other and different persons than deceased or any other officer who might come to evict them under said writ of possession; and that the same were made and done with reference to the Brewsters and their friends, and for the lawful and rightful purpose of resisting an unlawful attempt on the part of Brewster to put them off the place by force. That neither appellant nor T. E. Smith at any time had any idea or thought that the officers would come to put them off the place the second time under the writ at the time such acts and declarations occurred. The State objected to the testimony of the witness Harris on the ground that it was no part of any act or declaration of T. E. Smith introduced by the State; that it was the advice of a lawyer and interested party; that the advice is no defense to a crime and that the same was hearsay, and a self-serving declaration of a codefendant, and incompetent. The court sustained said objections, and excluded all of said testimony from the jury. It is a general rule that the advice of counsel furnishes no excuse to the client for violating the law, and can not be relied upon as a defense in either civil or criminal actions. 1 Am. and Eng. Enc. of Law, p. 897. In Weston v. Commonwealth, 111 Pa. St., 297, it was held, "On a trial of one charged with murder, testimony that defendant had consulted counsel, and had by counsel been advised that he had a legal right to maintain possession of the land in the dispute, about which the alleged murder took place, was held not to be admissible in evidence." In Gallaher v. State, 28 Texas Crim. App., 280, in discussing this question, Judge Willson, de-livering the opinion of the majority of the court, says: "It was not competent for any purpose, we think, to prove by said witness the advice he gave as an attorney to defendant in relation to said litiga-tion, or defendant's opinion of his legal rights in said litigation, or the advice given by the judge and others to deceased to accept a compromise offered her by Gallaher. * * * Nor can we see upon what principle the opinions and advice of his counsel in the land suit could be held admissible evidence in his behalf. Suppose his attorney had advised him that he would certainly be defeated in the suit and would lose the land, would such testimony be admissible in behalf of the State? Certainly not. Then why should it be admitted in his behalf? We know of no rule or precedent which would admit such testimony." See also Ward v. State, 42 Texas Crim. Rep., 435. Inde-pendent of these authorities we believe the proposition is sound, that appellant can not set up immunity from punishment by reason of advice of counsel, since such holding would be placing the advice of

the attorney above the law. We therefore hold that the court did not err in excluding this testimony.

By the fourteenth bill of exceptions appellant offered to prove by witness Ed Brewster that he had a conversation with T. E. Smith on July 20th; and that Smith stated he had moved back on the premises, that he had a right on the premises which had not been settled, and that witness would have to sue him, and then whatever the courts decided as to his rights he would abide by the decision; that his attorney had told him witness would have to sue him, and he would have a chance to defend the suit and have his rights in the matter decided by the courts; that the writ of possession had been fully executed, and that witness would now have to sue him either in trespass to try title or in forcible entry and detainer, and their dispute over the possession of the premises would be settled in the courts. The State objected to this testimony on the ground that the same was a declaration of coconspirators, self-serving declarations, and not in any way connected with the conversation introduced by the State. These acts and declarations are clearly self-serving and are not admissible.

By witness Ed Rancier appellant offered to prove, in substance, that T. E. Smith secured his services to assist in moving back on the premises, and Smith felt he could hold the premises against all parties if he could get in possession the second time; and that he got the guns to protect himself against a contemplated effort on the part of the Brewsters to regain possesion of the premises; and that this was his purpose in getting the guns. It appears from the statement of facts that the State proved divers and sundry declarations on the part of T. E. Smith, indicating malice, and a settled purpose on his part toward the officers who had previously ousted him, and armed himself for the purpose of resisting said officers; had partly barricaded his house, and was watching their approach at the time of the difficulty. To combat this, as shown by this bill, she proposed to show that Smith's purpose in getting the weapons was to protect himself against the contemplated dispossession by the Brewsters only. We believe this testimony was germane, going to show the intent with which he procured the weapons. Our statute on this subject is broader than the common law. In Green v. State, 17 Texas Crim. App., 395, we held that article 751 expands the common law rule with reference to such evidence. At common law when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what he said on the subject *at the time of making such confession or admission.* The above cited article does not restrict the explanatory act, declaration, conversation or writing to the time when the act, declaration, conversation or writing sought to be explained occurred; but extends the rule so as to render such acts or statements admissible, if necessary to a full understanding of or to explain the acts or statements introduced in evidence by the adverse party, although the same may have transpired at a

different time and at a time so remote even as not to be admissible as res gestæ." Koller v. State, 36 Texas Crim. Rep., 498; Wood v. State, 28 Texas Crim. App., 61. The same character of testimony was offered by bill number 16, through the witness Robert Dennis, as to the reason of Smith in securing a pistol. As to this matter we hold that where the State proposes to show a criminal intent against one procuring arms, appellant can show that his criminal intent, if any, was against another and different party. We do not wish to be understood as holding that he can introduce the opinion of attorneys as to his rights in the premses; but he can explain why he secured the arms and what he intended to do with them.

The seventeenth bill complains of the failure of the court to allow Harris to testify to advice and suggestions made T. E. Smith in reference to his rights along the line of the preceding bill. We do not think this testimony was admissible.

The court did not err in excluding the testimony of J. P. Kinnard as to the declarations and exclamations of defendant after the homicide. The bill shows that said statement occurred long afterward, and was not res gestæ, but was self-serving.

Nor did the court err in excluding the testimony of Brooker and A. J. Harris to the effect that Harris rented the disputed premises to tenants to make a crop for the year 1903, with the knowledge and consent of Brooker. Said rental contracts were all subsequent, and made dependent upon the order of sale.

Nor did the court err in excluding the testimony of A. J. Harris as to the statement Addison Smith made on the habeas corpus trial, since it was a self-serving declaration of a coconspirator after the consummation of the conspiracy.

Nor did the court err in admitting, over the objections of defendant, the written designation of a homestead, because the same showed that appellant and her husband had designated another and different parcel of land situated in the town of Temple as their homestead, which was necessary in order to make a constitutional and valid foreclosure on the land where the difficulty occurred.

In bill number 31 appellant urges "that the charge of the court taken as a whole is erroneous, in that it is made up of statutory definitions and abstract definitions of law, without any attempt to apply the same to the facts of the case; is argumentative in subject matter, form and arrangement; clearly calculated to disclose to the jury the opinion of the court as to the weight to be given to the end and as to the guilt of defendant." These objections are too vague and general to be considered and reviewed.

Appellant complains of the following portion of the court's charge: "And in case you believe beyond a reasonable doubt that the defendants conspired to resist any officer in the execution of the writ of possession read in evidence, then it would be immaterial whether they had

any personal animosity or cherished any malice towards I. B. Grubbs personally." We understand this to be the law. Kipper v. State, 8 Texas Ct. Rep., 852, 45 Texas Crim. Rep., 377.

Bill number 34 insists that the court erred in the twenty-first paragraph of the charge, which is "That the writ of possession and the return thereon read in evidence, as having been in the possession of I. B. Grubbs at the time of his death, was a valid legal process at the date of the homicide, was authorized by law; and it was the duty of the officer having the same in his possession to execute the same and return the same by the return day specified therein." In our opinion the writ was not functus officio and the court did not err in so charging. Where a writ of possession is issued, the sheriff has the right to execute it as many times as necessary until the day he is required to return said writ; and that it does not become functus officio until the date required for its return. In Murphy on Sheriffs, sec. 1021, this language is used: "A writ of possession may be issued without any return day stated in it, and so may be re-executed if the plaintiff, after having been put in possession, is ejected by defendant or any one claiming under him." Citing Jackson v. Hawley, 11 Wend., 182. "It is said, too, that an alias writ will be issued if the ejection takes place and the application is made before the writ is returned and filed, provided the intruder is the defendant or one in privity with him. But if the plaintiff be ousted by a stranger he will be driven to a new ejectment. The authorities on this subject are somewhat conflicting, but it would seem to be the better opinion that after the first writ is returned satisfied there can be no alias and the plaintiff will be driven to a new ejectment, or other like process; though it is otherwise during the life time of the original process." 26 Am. Dec., p. 436.

Crooker on Sheriffs, sec. 575, says: "Where the writ is not made returnable, as it seldom is, the sheriff may under it remove defendant or one claiming under him from the premises as often as he intrudes upon them." See also Freeman on Executions, secs. 474-477. The evidence in this case shows that appellant and her husband are the defendants in the original writ, and clearly the writ was ample authority for dispossessing them, inasmuch as it had not been returned at that time. We do not deem it necessary to review appellant's authorities on this question. Suffice it to say that wherein they hold contrary to the rule herein laid down, we can not agree thereto.

Appellant also insists that the court erred in failing to tell the jury that they could not consider the acts and declarations of appellant's co-conspirators for the purpose of proving a conspiracy; but that they must believe from the evidence, beyond a reasonable doubt, that the conspiracy was formed, before they could consider said acts and declarations. This charge should have been given. Chapman v. State, 8 Texas Ct. Rep., 392, 45 Texas Crim. Rep., 377; Loggins v. State, 8 Texas Crim. App., 434; Luttrell v. State, 31 Texas Crim. Rep., 493; Blain v. State,

31 Texas Crim. Rep., 248. We hold, under the authorities cited, that it was error for the court to fail to so charge the jury, since the acts and declarations of a coconspirator could not be considered for the purpose of proving the conspiracy; but the conspiracy must be proved aliunde beyond a reasonable doubt, and the court should have so charged, before the acts and declarations of the conspirator could be considered, since said acts and declarations are only admissible to throw light upon, illustrate and make manifest the purpose, object, motive and intent of the parties forming the conspiracy, and not to prove the conspiracy. We note that the learned trial judge in his qualification to the admission of the declarations of the coconspirator stated that he limited it in his charge to consideration for this purpose, and that said acts could not be considered by the jury unless they believed that the acts and declarations were made pending the conspiracy. It will be seen from the case of Hudson v. State, 43 Texas Crim. Rep., 420, and other cases cited above, that this rule does not prevail. But the declarations of a coconspirator can be admitted, although the same was made before the conspiracy was formed, though it is the duty of the court to limit the same for the purpose for which it was introduced, to wit, to illustrate the motive, purpose and intent of the parties forming the conspiracy.

Appellant further insists that the court erred in refusing to charge the jury that defendant could resist excessive force in the execution of the writ. There is no testimony in this record suggesting this issue. The officers having a valid writ, they had the right to go to the premises and use all reasonable force to execute it. There is nothing showing they did more than this. Hence it was not error to omit to charge on an issue not raised by the testimony.

There are various other assignments of error, but after a most painstaking and searching reading thereof, we do not believe any are well taken. We believe the charge of the court was full and fair in all respects, except in the particulars stated above.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, PRESIDING JUDGE.—I agree to the reversal, but do not agree that the writ of possession could be used as evidence. It was functus officio in my judgment. Nor do I agree that the statement of the husband could be used against the wife, appellant herein. She in my judgment should not be held conspirator with her husband. That she may be a principal may be conceded. I do not believe the Hudson decision is involved in this case. If the husband and wife can be held for conspiracy, then the Hudson case would apply as stated by brother Brooks. I may write out my views more fully.

HENDERSON, JUDGE.—I agree to the result reached reversing the case, but do not agree to all the views expressed in the opinion. The writ under which the officers operated and which they were attempting to enforce at the time of the homicide was not functús officio; and in my opinion the officers were authorized to act under it.

Under the doctrine of conspiracy only statements or declarations of T. E. Smith were admissible as against Mrs. Smith when she was not present, which were made after the formation of the conspiracy, and in furtherance thereof. I accordingly believe that the testimony as to what T. E. Smith said to the officers on the occasion of the first eviction, or shortly thereafter, when they were waiting for Mrs. Smith to get ready to go, was not admissible against her, she not being present at the time and there being no pretense that the conspiracy was then formed. However, the charge of the court adequately protected appellant against the evil effects of this testimony. Of course, husband and wife, according to my understanding, can be coconspirators to commit murder. All acts or declarations of Smith, such as getting arms and other preparations, when the circumstances indicate that the conspiracy had been formed, were admissible in evidence.

According to my view it was permissible for appellant to show any fact by competent evidence that rebutted the State's theory. The State's theory was to the effect that the conspiracy was against the officers who might undertake to re-execute the writ. On the other hand defendant's theory was that they did not intend to oppose the officers and did not expect the officers to attempt to re-execute the writ, but they did expect Brewster to attempt to regain possession. It was therefore competent for appellant to offer testimony in contravention of the State's theory on this point; and I think in this respect the advice of attorneys and what they told him could be shown.

I also believe that it was competent for appellant to show Grubbs' object or purpose in going into the house.