ADDISON SMITH v. THE STATE.

No. 2939. Decided May 10, 1905.

**1.—Murder—Evidence—Judgment and Writ of Possession—Functus Officio.**

Where in a prosecution for murder, there was evidence that the homicide resulted from an attempt on the part of officers of the law to execute a writ of possession against the parents of defendant and that he was a minor living with them at the time, and that he had entered into a conspiracy with them to resist said officers, there was no error in admitting in evidence all the proceedings in connection with and including the judgment in the original suit on which the said writ was based, as also the order of sale and said writ itself; as a stranger even would be bound by the said judgment and writ, and said writ not being functus officio.

**2.—Same—Res Gestae—Evidence—Official Mission of Deceased—Resisting Officer.**

In a prosecution for murder, which grew out of an attempt of officers of the law to execute a writ of possession against the parents of defendant, and resulted in the killing of one of the officers, it was competent for the State to show the mission of the said officers in going to the place which was held by the said parties and that their purpose was to execute said writ; and what transpired just before the homicide between the owner of the premises, father of defendant, and the said officers out in the yard, in view of defendant, who must have known the officer's official mission from the facts and surroundings, was part of the res gestæ of the transaction and admissible in evidence, especially when no opportunity was afforded said officer to disclose his purpose before he was shot down by defendant, and under such circumstances defendant could not claim self-defense or defense of his mother in resisting an officer.

**3.—Same—Common Law Rule—Husband and Wife—Conspiracy—Statutory Law —Evidence.**

While under the rule at common law prosecution for conspiracy is not maintainable against the husband and wife, unless some third person, in connection with them, join in the conspiracy—which rule seems to be applicable to a conspiracy pure and simple and not to a consummated act in which the conspiracy may be merged—yet by virtue of the statutes of Texas such rule is abrogated, and husband and wife may conspire, without the intervention of a third person,

to commit murder; and if either is being tried for the consummated offense, the doctrine of conspiracy, so far as the rules of evidence are concerned, is applicable under our system, and acts or declarations of either, though made in the absence of the other, are admissible against such other, if done pending the conspiracy and in furtherance thereof.

### 4.—Same—Evidence—Acts and Declarations of Co-Conspirators.

The rule laid down by this court in the case of Cox v. State, 8 Texas Crim. App., 254: that when the proof shows two persons were acting together with an unlawful intent in the commission of an offense, the common design and acting together makes them ipso facto conspirators; and that the previous acts and declarations of each or any such principal offender, in pursuance of the agreed plan, and tending to throw light upon it, or the motive or intent with which it was committed is and should be received as legal evidence against each and all, whether indicted, prosecuted and tried jointly or separately, not only still obtains, but has been extended in the light of more recent decisions, which hold that on a trial for murder where a conspiracy is shown, the acts and declarations of co-conspirators are admissible to prove the common design, purpose and intent of all the conspirators, whether such acts, etc., were made before or after the formation of the conspiracy, or whether the same were made before the defendant on trial entered into. the conspiracy.

### 5.—Same—Case Stated Under Above Rule.

Where on a trial of defendant for murder, the evidence showed that he and his parents were principals therein, inasmuch as all three of them were on the ground at the time the homicide was committed and participated therein, there was no error in admitting in evidence the acts and declarations of defendant's parents made in the absence of defendant, with reference to certain legal proceedings by which they were dispossessed of their property by the officers of the law and which occurred some time before the homicide, and in which they threatened that they would not peaceably submit to such proceeding again; the evidence further showing that defendant's parents had repossessed themselves of said property and that he acted with them when said officers came to dispossess defendant's parents a second time and he killed one of said officers; especially where the court in his charge limited the effect of this testimony to the necessity of prior proof of a conspiracy.

### 6.—Same—Acts and Declarations of Co-Conspirators After Conspiracy is Formed.

Where in a trial for murder, the theory of the State was that defendant had entered into a conspiracy with his father and mother to resist the execution of a writ of possession against his parents, and there was enough testimony to go to the jury that he did enter into such conspiracy, there was no error in admitting testimony which involved the procuring of arms and ammunition by his father after the latter moved back on the premises from which he had been removed by virtue of said writ, and after he had been joined there by the defendant; and also the testimony regarding the barricade of the doors and windows of the house with sacks of wheat, these acts being subsequent to the formation of the consiracy and in furtherance thereof; especially where the court limited such testimony with reference to the rule in conspiracy, more favorably than the law required.

### 7.—Same—Charge of Court—Third Parties Not Concerned.

Where in a trial for murder the theory of the State was that defendant had entered into a conspiracy with his parents to resist the officers in the execution of a writ of possession, and there was no attempt on the part of certain third parties, who were interested in the property subject to said writ, to retake possession thereof, after defendant and his parents had taken possession thereof, and there was evidence that defendant and his codefendants knew at the time of the homicide that it was the officers of the law who were attempting to dispossess them, the court was not required to charge with reference to a conspiracy of defendants to thwart any attempt on part of such third parties to retake possession of said property.

**8.—Same—Evidence—Rebuttal.**

Where in a trial for murder in which defendant was charged with a conspiracy to resist officers of the law in the executiton of a writ of possession, he had introduced testimony that his co-conspirators had had trouble with certain third parties who were interested in the property subject to said writ and not with the officers, one of whom was killed by defendant, it was admissible for the State to show by way of rebuttal that said parties and codefendants had amicable relations, and that all the said third parties said and did suggesting violence was with reference to an antecedent attempt by them to get possession of said property.

**9.—Same—Advice of Counsel—Judgment Conclusive Against Homestead.**

There was no error to exclude the testimony for defense with reference to the advice of counsel, to the effect that the property subject to the writ of possession and concerning which the trouble arose that resulted in the homicide was homestead, as that issue was withdrawn from the jury by the court, and correctly so, as the judgment upon which the said writ was based eliminated that question in a trial of defendant for the murder of one of the officers who attempted to execute said writ against defendant's parents, who were .charged as codefendants in a conspiracy for resisting said officer and slaying him.

**10.—Same—Bill of Exceptions Contradicted by the Record.**

Where the record showed that all the testimony of defendant's witness with reference to advice of counsel which was admissible and which he contended for was in fact admitted, the bill of exceptions fails to raise an issue.

**11.—Same—Fact Case—Charges Favorable to Defendant.**

See opinion for evidence held to sustain a conviction of defendant for entering into a conspiracy with his parents to resist the officers of the law in the execution of a writ of possession and to slay them if necessary, and that defendant slew one of said officers pursuant to such conspiracy, and not in the defense of his mother, although the court submitted a charge on self-defense in behalf of defendant's defense of his mother, and also a charge on manslaughter, both of which were probably more favorable than the evidence called for.

**12.—Same—Requested Charge—Supplied Defect of Main Charge.**

A charge of the court, in a trial of defendant for murder of an officer in the lawful discharge of his duty in the execution of a writ of possession against the defendant's parents who are charged as codefendants and co-conspirators, which in effect told the jury if defendant entered into an agreement or conspiracy with either his father or his mother to kill the officers in resistance of the writ of possession, then they could consider the acts and declarations of said father against defendant, while subject to criticism, could not injuriously affect defendant, as the conclusion is irresistible that if he entered into a conspiracy with one of them he did so with both of his parents; besides the special instruction of defendant which was given, sufficiently guarded against such construction of the main charge.

**13.—Same—Murder in The Second Degree—Charge of Court.**

See opinion for charge on murder in the second degree which in connection with other portions of the court's charge, and those requested by the defendant and submitted was sufficient. Reviewing Harrison v. State, 83 S. W. Rep.; 699; Ray v. State, 46 Texas Crim. Rep., 511, 81 S. W. Rep., 737; Spivey v. State, 45 Texas Crim. Rep., 496, 77 S. W. Rep., 444; Pollard v. State, 45 Texas Crim. Rep., 121, 73 S. W. Rep., 953.

**14.—Same—Reasonable Doubt.**

See opinion holding that the charge on reasonable doubt was sufficiently presented by the court.

Appeal from the District Court of McLennan. Tried below before Hon. Sam R. Scott.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*John B. Durrett* and *J. E. Yantis,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years; hence this appeal.

A branch of this case to wit: Catherine Smith v. State, 46 Texas Crim. Rep., 267; 10 Texas Ct. Rep., 984, was before this court at a former term. The facts on that trial were in a general way the same as on the present trial. Since then, the venue has been removed to McLennan County, and the appeal was prosecuted from a conviction in that county. The facts show that T. E. Smith and Catherine Smith were husband and wife, and Addison Smith (appellant) was their son, being a young man about grown. The Smiths were owners of a farm in Bell County, some twelve or thirteen miles from Belton. It appears that Smith became indebted some time prior to the homicide, and executed a mortgage or deed of trust on said premises. This mortgage or trustee deed was foreclosed. Pending this, some other instruments relating to a stay of sale were executed between the parties, and the sale was postponed for some time. The judgment appears to have been rendered in favor of the Union Central Life Insurance Company v. T. E. Smith and wife; but this was subsequently transferred to one J. M. Brooker. There is some evidence that it was afterwards transferred to Pendleton and Brewster, and by them transferred to Hall. However, these matters are immaterial in the disposition of the case. The land was finally sold by an order of sale under the judgment. At the execution sale Pendleton and the Brewsters became the purchasers. On July 17th, a writ of possession was issued to put the purchasers in possession of said premises. This writ appears to have been executed, at least in part, on the 20th of July. However, a day or two after the partial execution of the writ and the removal of T. E. and Catherine Smith from the premises, they returned and regained possession. Before the return day of the writ, and while it was still in the hands of the officers, they were called on to further execute the writ by ousting the Smiths from possession. The officers attempted this on August 6th, and while on the premises, in endeavoring to execute the writ, according to the State's theory, the homicide occurred. According to the evidence offered by the State, it is insisted that when T. E. Smith and Catherine Smith returned to the premises and regained actual possession thereof, they conspired together to resist the officers from regaining possession. There is some evidence tending to show they had advice from counsel that the writ of possession was functus officio; and that the same could not

be again executed, and that they were authorized to resist it. A short while after they regained possession of the premises, they were joined by Addison Smith (appellant) who returned from Arkansas. There is testimony tending to show that they prepared arms and ammunition to resist the offiers, and that they also barricaded the doors and windows of the house with sacks of wheat to unable them to defend their possession. On the day of the homicide, the officers Sparks, and Grubbs (deceased) went to the premises, being preceded by four or five wagons sent for the purpose of removing the Smiths and their property from the place. It is in evidence that when the wagons approached the premises, they stopped in front of the gate and asked for some water. T. E. Smith went out on the gallery with a gun in his hand, and motioned them to go around to a well or spring, some 150 yards from the house, which they did. Sanders (attorney for the Smiths) was at the house at the time. He came out about the time Sparks and Grubbs came up. T. E. Smith came out of the house and to the gate. About this time Sanders left. Sparks and Grubbs had some conversation with Smith. At this time he insisted they had no right to re-execute the writ of possession. They told him they had come for that purpose, and they hoped he would not interfere with them. There is no evidence that he consented for them to execute the process, but insisted they had no right to do so. The officers told him they had the writ, but he did not call on them to produce it. They started towards the house, and it appears he attempted to return to the house. The officers undertook to prevent him from going to the house by getting in ahead of him. When they had approached very near the house, Sparks seemed to be endeavoring to prevent Smith from getting into the house; and in the meantime Grubbs hurriedly went on to the gallery, and around to the door. He passed into the door, and almost immediately two shots were fired. The parties in the house at the time of the homicide were Mrs. Catherine Smith and Addison Smith. Both of these parties were seen by the officers: appellant lying on the bed, looking out the window at them while they were near the gate and as they approached the house; and Mrs. Smith looking through the screen door at them. No eye-witness testified to the homicide, except appellant, who stated, in effect, that he was lying on the bed, and that there was a shotgun also lying on the bed; that when Grubbs came hurriedly in the house, he made as if to seize his mother, who was standing right in front of the door; that he saw the parties stoop over the table, struggling over a gun. While they were struggling he heard a shot fired, and he thought it was Grubbs who had shot his mother with a pistol; that he immediately grabbed the shotgun and shot deceased. His theory was that he did so, not with any intention of resisting the officers in executing the writ of possession, but because he believed the officer had violently attacked his mother, and that she was in danger. On the other hand, the contention of the State was, that the parties had entered into a conspiracy to resist the execution of a writ of possession; that they had prepared arms and ammunition for

that purpose, and that when the officer Grubbs entered the house, no opportunity was afforded him to announce his purpose. But that immediately Mrs. Smith attempted to seize a gun, which was lying on the table, and deceased attempted to prevent her from getting and using it; that he was immediately fired upon by appellant in pursuance of their previous design to prevent an interference with their possession. To rebut the theory of the State, that preparation was made to resist the officers, appellant introduced evidence to show that they had no purpose to resist the officers in executing any writ, but that preparations had been made to resist any attempt of Pendleton and the Brewsters to regain possession. It was further urged as a part of appellant's defense that whatever preparation had been made to resist the officers, if any, by T. E. Smith and Catherine Smith, there was no proof showing he knew of such design or that he participated therein. This is a sufficient statement of the case in order to present the legal questions insisted on for a reversal.

We believe it was competent for the State to introduce, as was done, all the proceedings in connection with and including the judgment in the case of the Union Central Life Insurance Co. v. T. E. Smith and Catherine Smith, upon which the order of sale and writ of possession was issued, including the sale, order of sale and the writ of possession. It is true that appellant was not a party to said judgment or proceedings, but his mother and father were: he being a minor and living with them. Even as a stranger he would be bound by the judgment and could not resist the execution of the writ. In Catherine Smith v. State, supra, it was held that the writ was not functus officio, but the return day not having expired, and the same being still in the hands of the officer, it could be further executed. Muphree on Sheriffs, sec. 1021, citing Jackson v. Hawley, 11 Wend., 182; Crockett on Sheriffs, sec. 575; Freeman on Executions, sec. 474–5–6–7.

In this connection it is also strongly insisted by appellant that what transpired between T. E. Smith and the officers out in the yard when Smith left the house, just prior to the homicide, with reference to the writ of possession, and the fact that Grubbs had the writ and had come to execute it, should not have been introduced against appellant, because he was not present, and the statements of the officers to his father could not affect him. We believe this was a part of the res gestæ of the transaction, and T. E. Smith himself being the owner of the premises, it was only necessary to exhibit the writ to him. At any rate, it is shown by appellant's own testimony that he knew or had reason to believe that the parties in the yard, Sparks and Grubbs, were officers. There is no suggestion that he believed they were Pendleton or the Brewsters who had come to take possession by violence. Appellant was watching them from the bed through the window. It is further shown by the witness that as soon as Grubbs came into the house, immediately the firing began. According to appellant's own testimony there could have been no opportunity for Grubbs to have declared his

purpose and have exhibited the writ. He says, the struggle over the gun began at once. If there was no opportunity before deceased was shot for him to have disclosed his purpose, he would not be required to do so. Appellant knew that the parties at the gate were officers. He had previously seen the wagons arrive, which he must have known was for the purpose of removing his father's goods from the place. He had heard his father declare, that the writ of possession was functus officio, and could not be executed the second time. In other words, he knew enough to charge him with notice of the mission of the officers in coming to the premises. As was said in Plasters v. State, 1 Texas Crim. App., 673, if the party whose arrest is attempted under legal process knows the purpose and official character of the officer, and the arrest be otherwise lawful, it his duty to submit, and resistance is unjustifiable, though the officer makes no declaration of his official character or purpose. Here, as stated, there was no time afforded the officers to disclose their purpose to appellant. There was no opportunity for the officer, after he came into the house, to disclose his purpose to appellant or his mother. He was shot down at once. Under such circumstances appellant could not claim self-defense, or defense of his mother in resisting an officer. Cortez v. State, 4 Texas Ct. Rep., 1. As heretofore announced it was competent for the State to show the mission of the officers in going to the place, that their purpose was to execute the writ, and what transpired between the owner of the premises, T. E. Smith, and the officers out in the yard was a part of the res gestæ of the transaction. Appellant will not be heard to say that he was not bound by what transpired between the officers and his father in his view, especially when no opportunity was afforded the officer, after he entered the house, to disclose his purpose to them.

On the appeal of Catherine Smith v. State, 46 Texas Crim. Rep., 267; 10 Texas Ct. Rep., 984, we held that a conspiracy to commit murder could be formed between husband and wife. The question was not particularly discussed, and no authorities were cited in support of the proposition. We understand it to be now insisted that the rule at common law was different; that is, husband and wife could not be co-conspirators; and that there is nothing in our statute to change it. An examination of the common law text writers discloses that prosecution for conspiracy is not maintainable against the husband and wife only, because they are esteemed as one person in law, and are presumed to have but one will. 1 Russell on Crimes, p. 39; 2 Wharton Crim. Law, 1392; Peo. v. Miller, 82 Cal., 107; State v. Clark et al. (Del.), 33 Atl., 310. However, these same common law authorities assert the principle that if some third person, in connection with the husband and wife, join in the conspiracy, the rule above mentioned does not apply. So that in this case, if it be conceded that the common law rule is in vogue here, then the fact that appellant was a member of the conspiracy, together with his father and mother, would take this case out of the common law rule. We would observe, however, with reference

to the common law rule that so far as we are advised, the authorities
are speaking of a conspiracy pure and simple, and not of a consummated
act in which the conspiracy might be merged in the substantive
offense. But even if it be conceded that at common law the husband
and wife could not be joined as co-conspirators in the consummated
act of murder committed by them, so as to make declarations of one of
the spouses pending the conspiracy to do the act and in pursuance
thereof, made in the absence of the other, admissible against such other,
we believe that our statutes in this State contravene the common law
rule in such measure as to render it entirely inapplicable, especially
when viewed in the light of our advanced civilization, which in a great
measure has emancipated the wife from the thralldom under which she
formerly labored under the English system. Our statute with reference
to conspirators, and who may be engaged in a conspiracy, makes no
exception in favor of the wife. Article 953 to 960, inclusive, Code
Crim. Proc. Viewing our entire body of laws, each individual person
is amenable thereto, except as provided by statute. So we have article
36, Penal Code, providing that a married woman who commits an offense
by the command or persuasion of her husband, shall not in any case be
punished by death, but may be imprisoned for life, etc. This is an
exception in favor of married women. But no such question is raised
in this case. Again, it is provided that all persons are principals who
are guilty of acting together in the commission of an offense. The
wife may be a principal or an accomplice; but there is an exception in
her favor, or in favor of the husband that neither can be an accessory
to the other. So we take it that husband and wife may conspire to-
gether, without the intervention of a third person, to commit a murder;
and if either is being tried for the consummated offense, the doctrine
of conspiracy, so far as the rules of evidence are concerned, is appli-
cable, under our system. That is, when the conspiracy has been once
established between them to commit murder, acts or declarations of
either, though made in the absence of the other, are admissible against
such other, if done pending the conspiracy, and in furtherance thereof.

Appellant reserved an exception to the action of the court permit-
ting the witness J. E. Sparks to testify that on Saturday evening, July
18, 1903, while moving the Smiths out the first time, in the presence
of several others, he had a conversation with T. E. Smith, who re-
marked, that it looked like we were in a big hurry to-day moving him.
He said it was the worst thing that ever happened to him. He said
before he would go through such a thing again, he would get his win-
chester and shoot until he killed somebody; said he had three boys and
he was going to teach them to do the same thing if ever anything of
that sort came up with them. Grubbs remarked, "You ought not to
blame the officers." To which Smith replied, "By God, they ought not
to put themselves up as targets then." Also in the same bill appellant
reserved exception to the testimony of Pendleton, who testified that
during the time of the execution of the first writ, or a day before that,

he was going over the field to get the tenants to attorn to him, and found Mrs. Smith at home, but Mr. Smith was not there; that he had a conversation with her, in which he told her: "That I supposed she knew we had bought the land at the sale, and asked her if she and Mr. Smith had decided what to do about it; she replied that she did not know what Mr. Smith was going to do, but she knew what she was going to do. I asked her what she was going to do; she declined to say." This was objected to on the ground that it was hearsay, and could not affect appellant, he not being present. That it antedated any conspiracy, and that the remarks were not made in furtherance of any conspiracy then existing. Certain other testimony of the same character was introduced. In the opinion of the writer, while this may not have been admissible under the doctrine of conspiracy, however, as was held in Cox et al. v. State, 8 Texas Crim. App., 254, although this testimony was not admissible, because no conspiracy then existed, and even if the conspiracy had existed it could hardly be said that these remarks were made in furtherance of the conspiracy, yet under the doctrine of principals such testimony was admissible. The court said in that case: "To our minds, a great deal of the trouble, confusion and discussion with regard to conspiracy, where two or more are charged with the commission of crime, might and can be obviated by keeping in mind these statutory provisions. If the parties can be identified at the time and place as joint participants in the commission of the crime, why the necessity of going behind that fact to establish a conspiracy to do the act already accomplished; and for which the law denounces them as principal offenders and liable to punishment as such? Why want a better predicate, or any further evidence even of a conspiracy, if their presence and guilty participation is already established? To us it seems too plain to admit of argument, that when two or more are found acting together with an unlawful intent in the commission of an offense, the common design and acting together makes them ipso facto conspirators,—endows them as a body with the attribute of individuality,—merges the conspiracy to do the act in the act itself; and that the previous acts and declarations of each or any such principal offenders in pursuance of the agreed plan, and tending to throw light upon it or the motive or intent with which it was committed, is and should be received as legal and admissible evidence against each and all, whether indicted, prosecuted and tried jointly or separately." Here all three of the parties, T. E. Smith, his wife and appellant were principals and under the rule laid down above, ipso facto, conspirators. They were all on the ground at the time the homicide was committed and participated therein, and the motive and intent of each of the principals was competent testimony. Besides this, the court in its charge limited the effect of this testimony as to conspirators, by instructing the jury in effect, that they could only look to acts and declarations and conduct of others in case they believed a conspiracy

had been established, and then only such acts, etc., as were in further-
ance of the common design.

There is certain other testimony, which involves the procuring of
arms and ammunition by T. E. Smith, after he had moved back on the
premises, and after he had been joined there by his son (appellant).
And also the testimony regarding the barricade of the doors and win-
dows of the house with sacks of wheat. These acts, in our opinion,
were subsequent to the formation of the conspiracy, and were unques-
tionably in furtherance thereof, and were admissible against appellant,
provided he became a party to the conspiracy to resist the officers in
attempting to execute the writ of possession. This simply involves
the question whether or not, there was enough testimony to go to the
jury as to whether Addison Smith (appellant) entered into the con-
spiracy. We think the testimony is abundant to the effect that both T.
E. Smith and his wife, when they went back on the premises, had de-
termined to hold possession thereof against any attempt of the officers
to regain it, under the writ which they had been advised was functus
officio, and could not be again executed. True, there is testimony tend-
ing to show that what they did was with reference with resisting
an anticipated attack on the part of Pendleton and the Brewsters.
Still this theory did not preclude the State from insisting on the other
theory, provided there was evidence to support it. As stated, there
could be no question that they procured advice of counsel to the effect,
that the officers could not re-execute the writ of possession; that it was
functus officio. T. E. Smith and his wife knew the officers, and un-
doubtedly knew Sparks and Grubbs when they came. They saw they
were prepared to remove them, having brought wagons for that purpose.
Smith went out, as is testified, for the purpose of parleying and pro-
testing against the removal. Both Catherine Smith and appellant were
in view of what was transpiring in the yard. Not only so, but they
were prepared to resist any intrusion into the house. Appellant was
lying on the bed with a shotgun by his side, looking at what was
transpiring in the yard. Mrs. Smith was looking through the screen-
door at them. She also had a gun conveniently near on the table.
She knew who the parties were in the yard, and knew that it was not
Pendleton and the Brewsters. If appellant entertained any doubt as
to whom these parties were he should have inquired of his mother, as
a prudent, law-abiding man. He states himself that he knew they were
officers, and was bound by the tangible facts before him to take notice
of their purpose. It is true that throughout the record this defendant
is remarkably reticent. In his testimony he disavows knowledge of the
most obvious facts transpiring around him. But there are some things
so plain as to challenge denial or contradiction. Notwithstanding his
reticence he will be held to take notice of those physical facts and sur-
roundings which declared the purpose of his father and mother to resist
the ejection by the officers at all hazards. There is enough in this
record to charge him with knowledge of the pending conspiracy and its

purpose, and he cannot escape responsibility by simply denying that he did not understand or know the intent and purpose of his codefendants. So that all testimony indicating acts or conduct of his codefendants transpiring after the formation of the conspiracy, and in furtherance thereof, was admissible against him. The court properly guarded all of this testimony in the charge; and of course, if appellant's theory that he was not a party to a conspiracy, was correct, then, under the charge of the court, he was not affected by any such testimony. The charge of the court was even more liberal to defendant than he was entitled to, because even as to the acts of co-conspirators the jury were instructed that they could only be considered for the purpose of illustrating the motive, purpose and intent of the parties forming the conspiracy, whereas the law is, that such acts of the co-conspirators become the acts of appellant.

In this connection appellant contends that the court should have instructed the jury with reference to the conspiracy to thwart any attempt on the part of Pendleton and the Brewsters to retake possession. There was some testimony admitted on this line, but there was no attempt on their part to retake possession, and, as stated, the parties knew at the time of the homicide that it was not Pendleton or the Brewsters that went there for the purpose of securing possession, but officers of the law. We do not think the court was required to charge further on this subjet than was done.

Some objection is urged to the admission of conversations detailed by Pendleton and the Brewsters, which they had with T. E. Smith on or about July 6th, in which they manifested an amicable disposition. We think it was proper, under the circumstances of this case, to bring forward .in testimony all the salient facts attending the service of the first writ of possession, and matters even which antedated that. As stated by the court in his explanation, there was testimony introduced by appellant to the effect that Smith and his wife were having trouble with Pendleton and the Brewsters, and that all they said and did suggesting violence was with reference to an antecedent attempt to get possession by them. The court further states that he believes the testimony of these conversations and amicable talks was admissible in rebuttal of this character of evidence. In this we concur.

There is a long bill of exceptions (number 14) with reference to the testimony, and refusal to permit certain testimony of the witness A. J. Harris. We believe that the court in his explanation properly eliminated all the testimony relating to the designation of the homestead; that all of that portion of the testimony was withdrawn from the consideration of the jury, and they were instructed not to consider the same. We do not believe the question of homestead, under the circumstances of this ·case, cuts any figure. So far as this testimony is concerned, both T. E. Smith and his wife, were parties to the judgment, and whatever rights they may have formerly had with reference to any homestead were adjudged in the decree. They were estopped to deny the same.

Bill number 15 is also quite lengthy and is reserved to what appellant was not permitted to prove by witness Harris. We are not clear as to the purpose of the bill, but taking the explanation of the court, in connection therewith, it occurs to us that all of the testimony that was really admissible, so far as the witness Harris was concerned, he was permitted to state. Harris testified, according to the court's explanation, that he advised T. E. Smith, after he had moved back upon the premises that the officers would not and could not execute that writ (meaning the writ of possession) the second time, after it was fully executed. The same witness also testified that on the afternoon before the killing, in a conversation with said Smith over the phone,—Smith being in Temple and witness in Belton,—he told witness in regard to the sheriff coming out to 'put them out of possession; that he did not think the sheriff would undertake it. Whatever benefit appellant was entitled to from the advice of Harris, it seems the court permitted him to prove. It will be seen, however, that while Harris was disposed to advise his client that the officers would not undertake to re-execute said writ, he was careful not to advise them that they could resist the officers.

Appellant urgently contends that no conspiracy was shown on his part to resist the officers if they attempted to take possession, or that in order to prevent them that he with his codefendants had determined to slay the officers; and that the State's case is not made out as against this appellant. It will be noted in this connection that the court, besides giving the charge on manslaughter, gave a charge on self-defense, which substantially told the jury if they believed Addison Smith killed deceased, but at the time deceased was making an attack on Mrs. Catherine Smith, which caused defendant to have a reasonable expectation or fear of death or serious bodily injury to the said Mrs. Catherine Smith, and acting under such reasonable expectation or fear he killed deceased, they should acquit him. Now this charge was given in favor of appellant regardless of any conspiracy. It was tatamount to telling the jury that although they might believe a conspiracy had been formed to resist the officers in taking possession of said premises, yet, if deceased in the first instance made an attack on Catherine Smith, which caused defendant to apprehend death or serious bodily injury to her, he would have the right to slay him. The jury evidently did not believe in this theory, and they refused to believe it notwithstanding the plausible account given of the homicide by appellant. He testified on this line: "I was lying across the bed with my head near the window, and could see out where they were, plainly. After Mr. Saunders got in his buggy and I saw my father and the two men standing there talking, I didn't notice them for a moment or two, and then my attention was attracted by their movements. I noticed that they had moved up closer to the house, and my father seemed to be trying to come to the house, and the two men closed upon him, and he folded his arms and moved this way and that way towards the house, and they would get between him and the house. When I noticed this, I think I raised up on my elbow

so as to see better. In a few seconds they got up pretty close to the steps, and the man that I afterwards learned was Mr. Grubbs took a rapid stride up the steps and on the gallery, and passed out of my sight towards the door. After he passed from my sight towards the door, my attention was called to my mother. She was two or three feet inside and directly in front of the door, and seemed to be in the act of moving to the door. About the time I saw her, Grubbs came through the door meeting her, and she threw up both hands in front of her, and said: "Don't you touch me. Don't you put your hands on me." And she stepped back towards the table at the front of the bed. In an instant after she stepped back, they (both of them) stooped over the table, and in an instant they raised up and I saw the winchester rifle between them. Mother had the gun by the stock with her right hand and by the barrel with her left, and Grubbs seemed to have her by one arm, and to have his hand on the gun over her other hand. They both stooped over the table to get the gun, and when they came up the gun was raised between them, and he immediately commenced trying to wrench the gun from her and force her back towards the partition door. I whirled off the bed, and about the time I got on my feet on the floor I heard a report, and saw a flash between them near the partition door, and my mother gave a sort of smothered scream. I picked up the shotgun off the bed and fired at him at once, and he fell to the south-west a little to the left. I think the winchester rifle fell to the floor with him; it was lying near him when I saw it next. I am not positive what became of my mother when he fell. She came to me shortly after. As soon as I fired, I turned and looked out of the window to where my father and the other man were and saw them scuffling over a pistol. They were just east of the gallery and a few feet south of the steps, and my father had the pistol by the barrel and this man had it by the handle. I cocked the other barrel of the gun and covered this man through the window, and about the time I did this, they quit struggling over the pistol and stood there holding the pistol between them; and my mother came to where I was by the bed. I gave her the double-barreled gun, and I picked up the winchester shotgun and we went out on the gallery, and my mother told this man to turn my father loose. They walked together, both holding to the pistol, out near the gate, and then my father turned the pistol loose and the man put it in his scabbard."

In order to understand this testimony there are certain other facts necessary to be taken into consideration. Deceased did not draw his pistol; it was found on his left side in the waistband of his pants, under his vest, after he was killed. The gun that was fired was the winchester rifle that Mrs. Smith and deceased were struggling over. It was also proven by one or two witnesses that Mrs. Smith exclaimed, shortly after the shooting, either before or at the time she came out on the gallery, "Didn't I tell you I would fight for my home?" It was also shown that with her gun in hand she made Sheriff Sparks leave the

premises. Now, appellant cannot claim ignorance of what transpired in his immediate presence at the time and just before the homicide. For ought that appears the officer did not have time to make any declaration of his intention before Mrs. Smith exclaimed: "Don't you touch me; don't you put your hands on me." And if we read this testimony correctly she went to the table for the gun. This witness says she stepped back towards the table at the front of the bed, and in an instant after, both of them stooped over the table. However, when they raised up, he says that his mother had the gun by the stock with her right hand and by the barrel with her left, and Grubbs seemed to have her by one arm; and to have his hand on the gun over her other hand. Now, if appellant saw all this, he evidently saw that Grubbs was attempting to take the gun away from her to prevent her shooting him. He knew he was an officer; had been watching him through the window, and he is held to know his purpose in coming there, as he unquestionably knew enough to charge him with notice of such purpose. As he relates, when he witnessed this struggle of Grubbs to get the gun away from Mrs. Smith, and he heard a shot fired, he immediately shot Grubbs. Not only this, but without waiting to see whether or not his mother was shot, he immediately turns and covers the other officer, who was in the yard struggling with his father with his shotgun. He joins his mother in going on the gallery, making the officer desist, and making him leave the premises, and hears her declare, "Didn't I tell you I would fight for my home." We think that the jury, viewing these facts, in connection with the undisputed physical facts and other facts connected with the case, were fully warranted in disbelieving the defensive theory of appellant—that he slew deceased to prevent deceased from killing his mother; and in giving credence to the theory of the State to the effect that the homicide was committed in order to prevent the officers ejecting appellant's father and mother from the premises under the writ of possession. Indeed the law is, if appellant (which the facts here presented tend to show), engaged in a conspiracy with his father and mother to prevent the officers taking possession of the premises under the writ of possession, and if necessary to slay them in order to prevent them from executing the writ, then he could neither set up self-defense in favor of his mother or himself, provided the officers did not use unnecessary or excessive force. And we fail to see in this record any such excessive or unnecessary force, with the resistance offered. They did what an officer would be expected to do in attempting to prevent T. E. Smith from getting into the house, and in getting into the house themselves. If Smith, when approached by the sheriff near the gate and possession demand of him, had consented thereto; in other words, if he was not opposing the execution of the writ of possession, we would expect from him an entirely different coure of conduct. When he saw his protestation to the officers was of no avail, but that they intended to take possession when they advanced towards the house for that purpose, we would expect him to go with the officer in

a peaceful manner; if necessary open the door for him. Certainly we would expect him to request the inmates of the house to permit the officers to enter; instead of that his entire demeanor was one of opposition. According to the testimony of the officers, his endeavor was to get in ahead of them, evidently to enter the house first. On the way to the house and just about the time the officers entered the door, T. E. Smith (appellant's father) uttered the expression, "Look out boy," which, although appellant states he did not hear, in the light of events which transpired about that time, must appear to be very significant, and suggests an understanding between the inmates of the house and T. E. Smith, appellant's father. Indeed, it occurs to us, all that was said and done by the parties, Smith, his wife and appellant, after the officers entered the yard, and after T. E. Smith presented himself to the officers and protested against their taking possession, was done with concerted design. T. E. Smith, not only protested but opposed the officers taking possession under the writ; he threw himself in their way to prevent them entering the house; one of the officers had to draw his pistol in order to endeavor to overcome his resistance; he grabbed the pistol, and persisted in his opposition; and as soon as the other officer (deceased) entered the house he was shot down by the parties, who are charged with notice of the purpose of the officers in coming to the premises and who were looking on and saw what transpired in the yard. In our opinion the jury were amply justified in believing that the parties, appellant, his father and mother, had conspired together to resist the execution of the writ and taking possession of the premises thereunder; and if necessary, to slay the officers, in order to prevent them from taking possession. The evidence was ample to induce this belief, and the jury were justified in adopting it. We have examined this record carefully, and we do not believe it contains any errors of a reversible character. The judgment is affirmed.

*Affirmed.*

BROOKS, JUDGE.—I concur in the affirmance. However, I do not agree with some of the views expressed by the writer of the opinion, wherein an attempt is made to draw a distinction between the law of principals and the law of conspirators. My views on this question were thoroughly discussed in Catherine Smith v. State, 46 Texas Crim. Rep., 267; 10 Texas Ct. Rep., 984. I endorse the decisions therein cited.

ON REHEARING.

November 1, 1905.

HENDERSON, JUDGE.—The judgment was affirmed at the Austin term, and now comes before us on motion for rehearing.

In the original opinion we discussed at length the doctrine of conspiracy, involving the charge of the court and the admission of testimony and it is not deemed necessary to again review that question. How-

ever, appellant has seen fit to criticise the court's citation and discussion of the case of Cox et al. v. State, 8 Texas Crim. App., 254. In the original opinion we copied an excerpt from that opinion, in which the court stated, in effect, that much difficulty would be avoided by keeping in mind the statutory provisions with reference to principals. The court there stated that when the proof shows two persons were acting together with an unlawful intent in the commission of an offense, the common design and acting together makes them ipso facto conspirators; and that the previous acts and declarations of each or any such principal offender, in pursuance of the agreed plan, and tending to throw light upon it, or the motive or intent with which it was committed is and should be received as legal and admissible evidence against each and all, whether indicted, prosecuted and tried jointly or separately. In commenting on what was stated, appellant in his motion intimates that the court did not act on this principle at all, but excluded the declarations of Meador, testified to by witness Kilgore. We understand the court did exclude a part of Kilgore's testimony; that is, that portion which related to a conversation which took place prior to the killing of Geo. Brazzell on the way to the house of Hardin. Kilgore testified to another conversation between himself and Meador after they left, Hardin's house. We must confess it is difficult to make a distinction between the testimony of this witness as to what was said before arriving at Hardin's house, and what was said after leaving there. However the court drew a distinction, using the following language: "But it is said that the declarations of Meador simply showed a willingness or intention on his part to do certain things, without showing that any one else had agreed to act with him at that time. This objection is only applicable to the expressions used by Meador in the first conversation with Kilgore, on the way from Cox's to Hardin's. Upon mature reflection, we are of opinion that this testimony was not admissible under any rule of evidence, but was directly in conflict with all the known and recognized rules. The general rule is that, 'the evidence of what was said and done by the other conspirators must be limited to their acts and declarations made and done while the conspiracy was pending, and in furtherance of the design,—what was said by them before or afterwards not being within the principles of admissibility.'" The court further says: "With regard to the two other objections to the testimony of Kilgore as to his conversation with Meador, which we have pointed out above, we deem it only necessary to say that, as urged, the objections are not tenable. 'If two or more combine to do an unlawful thing, and the act of one, proceeding according to the common plan, terminates in a criminal result, though not the particular result intended, all are liable.'"

Now, we understand from the opinion in said case, that in proving a conspiracy to commit a crime, proof that two parties acted as principals in the commission of said crime, furnishes proof of the common intent to do that crime. If there is testimony tending to show that a

conspiracy must have been formed sometime before, in pursuance of which the crime was committed, the acts or declarations of either of said parties, in furtherance of the common design, though made in the absence of the other, would be evidence against both. We think there is logical reasoning in the rule, if one party commits a crime, and this is shown to have been upon motive, and another party is shown to have assisted and coöperated with him in its actual perpetration, but no motive is shown as to the latter, the motive of his co-principal will be attributed to him. In this case, as stated in the original opinion, the court submitted the issue of conspiracy to the jury, and instructed them, if this conspiracy was not shown, that they would not regard the acts and declarations of other alleged conspirators introduced in evidence, in the absence of appellant. And the court further in this charge, it appears to us eliminated all of the harm that could come from the introduction of such testimony in the absence of any conspiracy shown, to the motive and intent which may have actuated the party making the declaration. Furthermore, it may be stated in the opinion of the writer that recent authorities have gone to a greater extent in admitting this character of testimony than the Cox case and others cited by appellant. See Stevens v. State, 42 Texas Crim. Rep., 154, and Hudson v. State, 43 Texas Crim. Rep., 420, and see also Smith v. State, 21 Texas Crim. App., 96, and Harris v. State, 31 Texas Crim. Rep., 411. In said cases it was held, that on a trial for murder, where a conspiracy is shown, the acts and declarations of co-conspirators are admissible to prove the common design, purpose and intent of all the conspirators, *whether such acts and declarations were made before or after the formation of the conspiracy,* or whether the same were made before the defendant on trial entered into the conspiracy. Where a party knowingly enters into a conspiracy after its formation, he is held to have adopted all the previous acts, declarations and designs of the conspirators, previously made, which tend to illustrate the common design, purpose and intent with which they all acted. While the writer believes these cases go too far, yet they have not been overruled, and clearly the greater portion of the testimony objected to by appellant is admissible under said decisions, and that which may not be admissible was so limited by the court as to destroy any harm that might otherwise have resulted to appellant.

Appellant objected to the following charge, and insists on a reversal on that account: "If you believe defendant entered into a conspiracy with T. E. Smith and Catherine Smith, or either of them, etc., then you will consider the acts and declarations of T. E. Smith, but can consider them only for the purpose of illustrating the motive, purpose and intent of the parties, forming the conspiracy, if you conclude from the other evidence in the case, that such a conspiracy was in fact formed. You are further charged that unless you find beyond a reasonable doubt that the conspiracy was formed, and that Addison Smith (defendant) was a party thereto, then you will exclude from your consideration

all the acts and declarations, if any, of T. E. Smith and Mrs. Catherine M. Smith, from your consideration in this case." Appellant insists that this charge is erroneous, in that it told the jury, if appellant entered into an agreement or conspiracy with either T. E. Smith, or Mrs. Catherine Smith to kill the officers, in resistance of the writ of possession, then they could consider the acts and declarations of T. E. Smith against appellant. That is, if appellant formed a conspiracy alone with Mrs. Catherine Smith they could consider the acts and declarations of T. E. Smith against appellant, with whom he had not formed a conspiracy. Of course, this charge is subject to the criticism aimed at it by appellant, still we are unable to see how it could have injuriously affected him, for the conclusion is irresistible if he entered into a conspiracy with one of them, he entered into a conspiracy with both. In this connection we call attention to the charge asked by appellant on this subject, and given by the court, as follows: "You are charged that mere knowledge of the existence of a conspiracy on the part of the defendant does not make him a party to such conspiracy, but the evidence must show beyond a reasonable doubt that the defendant not only knew of the conspiracy, but participated in such conspiracy, and if you do not so find from the evidence, you will not consider the evidence of acts and declarations of T. E. Smith and Mrs. Catherine Smith, but disregard the same in your consideration of the case." Looking to the testimony and to the charge of the court in connection with the requested charge we cannot see how the jury could have been misled to the prejudice of appellant on this subject of conspiracy.

Again in his motion for rehearing, appellant calls our attention to the following charge: "If you believe from the evidence beyond a reasonable doubt that the defendant, either alone or acting with others, with a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden transport of passion, aroused without an adequate cause, and with intent to kill, did shoot with a gun, and thereby kill J. B. Grubbs, as charged in the indictment, you will find him guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any period not less than five years." It is insisted that this charge does not even tell the jury that the act must have been unlawful, and omitted to tell them that it must have been done with implied malice. That is, it simply instructs the jury, if appellant in a sudden transport of passion, aroused without an adequate cause, with intent to kill, did shoot and kill deceased, he would be guilty of murder in the second degree. It is urged that this definition is entirely consistent with a lawful killing in self-defense. In this regard we are cited to a number of authorities, which are invoked to sustain appellant's contention. In Harrison v. State, 83 S. W. Rep., 703, there was no charge on manslaughter and adequate cause was nowhere defined. In Ray v. State, 81 S. W. Rep., 737, there was no charge on manslaughter and adequate cause was not defined, and the court found other vices in the charge.

In Spivey v. State, 77 S. W. Rep., 444, the conviction was for murder in the first degree, and the court held that the charge was so framed, as that the jury might believe, if he did not act under sudden passion they could not convict him of murder in the second degree, but were bound to find him guilty of murder in the first degree. It was further held, that the reasonable doubt was shifted and also that no charge was given on manslaughter, from which the jury might find the definition of adequate cause. In Pollard v. State, 73 S. W. Rep., 953, there was no charge on manslaughter and no definition of adequate cause, and it was held in a prosecution for murder, where the court charged the jury that defendant would be guilty of murder in the second degree, if he shot deceased in a sudden transport of passion, aroused without adequate cause, in such case it was error not to give a charge on manslaughter, defining adequate cause. It is not necessary to review the other cases cited. So far as we have been able to discover, none of them are any more in point than those reviewed. Here there was a charge on manslaughter, and adequate cause defined, and immediately following the charge complained of, the court gave this charge: "If you believe from the evidence beyond a reasonable doubt that the defendant with a deadly weapon, in a sudden transport of passion, aroused by an adequate cause, as the same has hereinbefore been defined, did unlawfully shoot with a gun, and thereby kill J. B. Grubbs, deceased, as charged in the indictment, then you will find defendant guilty of manslaughter, and assess his punishment at confinement in the penitentiary for any term of years not less than two nor more than five. Now, it occurs to us that while it may be conceded that the charge in question should have been more full and explicit, yet that the jury in considering the definitions given of murder on implied malice and manslaughter could not have been misled. In this connection it may be observed that the court not only gave a charge on self-defense, which authorized the jury to acquit, if they believed the officer first assaulted appellant's mother, and from his (appellant's) standpoint put her in danger of life or serious bodily harm, he was authorized to slay deceased regardless of any conspiracy. Furthermore, appellant's requested instruction was given to wit: "You are charged that even though you may find from the evidence that there had been a conspiracy between the defendants and others to resist the officers, and you further find from the evidence that the killing was not done in furtherance of such conspiracy, but was done by defendant in the necessary defense of his mother, under the law as given you in charge, then you will acquit the defendant." With all these charges before the jury they found appellant guilty of murder in the second degree. Murder in the second degree had been defined by the court and a full definition given of implied malice. It is said, however, that the jury were not even told that the killing must be unlawful. They were told that, "if the killing was upon passion aroused without adequate cause, etc." If the killing was upon passion, and this passion was not even aroused

by adequate cause, which was defined by the court in the charge on manslaughter, it was necessarily unlawful, and the jury could not have confused this charge with either the charge on manslaughter or self-defense to the detriment of appellant. The testimony amply authorized them to find appellant guilty of murder in the second degree.

As to the charge on reasonable doubt, that was sufficiently presented by the court. A charge was also given the jury applying the reasonable doubt as between the degrees of murder and manslaughter. This was sufficient. It is not necessary to discuss other matters suggested and ably argued in appellant's brief, as they were reviewed in the original opinion.

Motion for rehearing is accordingly overruled.

*Overruled.*